743 N.E.2d 1148 (2001)
In the Matter of the COMMITMENT OF G.M.
G.M., Appellant-Respondent,
v.
State of Indiana, Appellee-Petitioner.
No. 53A04-0010-CV-439.
Court of Appeals of Indiana.
February 12, 2001.
*1149 Michael J. Spencer, Bloomington, IN, Attorney for Appellant.
Bret D. Raper, Bloomington, IN, Robert D. Mann, Andrews, Harrell, Mann, Carmin & Coyne, P.C., Bloomington, IN, Attorneys for Appellee.

OPINION
RILEY, Judge

STATEMENT OF THE CASE
Appellant-Defendant, G.M., appeals the trial court's order of involuntary commitment for a period to exceed ninety days at the Center for Behavioral Health, in Bloomington, Indiana. G.M. also appeals the trial court's order for medication with or without his consent.
We affirm.

ISSUES
G.M. raises two issues on appeal, which we restate as follows:
1. Whether the trial court erred in finding that the State provided clear and convincing evidence to warrant his involuntary commitment.
2. Whether the trial court erred in finding that the State demonstrated by clear and convincing evidence that the probable benefits from the proposed forced medication outweighs the risk of harm.

FACTS AND PROCEDURAL HISTORY
G.M. is a 53-year-old male. He has been suffering from mental illness since the age of 14. He has been diagnosed with Schizoaffective Disorder and with Narcissistic Personality Disorder. He has been hospitalized approximately 31 times for this mental illness.
On July 31, 2000, an emergency detention application was filed. The application alleged that G.M. was having suicidal *1150 thoughts. It further indicated that he was making threatening remarks to his psychiatrist, Dr. Harter.
On August 1, 2000, a petition for involuntary commitment was filed by Kristin Shockey (Shockey), a health officer. Shockey is a case manager at the Center for Behavioral Health in Monroe County, Indiana, and G.M.'s case manager for the preceding six months. In the petition, Shockey maintained that G.M. had suicidal ideations as well as homicidal ideations. The petition was accompanied by a physician's statement by Dr. Harter. In his statement, Dr. Harter alleged that G.M. was dangerous to himself and others. Specifically, he stated:
Since stopping his [G.M.] medications he has had several brief stays at Transitional facility for suicidal thoughts. He has become increasingly paranoid to the extent that he believes medication is tainted with microscopic robots. He set off a smoke alarm with a lighter due to paranoia. He also told me that he would likely kill me if I persisted with involuntary treatment.
(R. 13). Finally, Harter concluded his statement with the following: "I am specifically requesting a forced medication order in addition to regular commitment." (R. 14).
On August 15, 2000, a hearing on the petition for involuntary commitment was held. At the hearing, Dr. Harter testified that G.M. is gravely disabled. As a basis for his opinion, Harter stated, "When he [G.M.] becomes delusional and depressed as he has been frequently lately he essentially just stops functioning. He doesn't eat well. He stays at home. He defecates on himself. He's often covered in vomit and his own excrement ..." (R. 34). Additionally, Dr. Harter testified that G.M. would substantially benefit from taking an anti-psychotic medication called Haldol Decanoate (Haldol). G.M. has refused to take this medication voluntarily because he is worried about the potential side effects. Dr. Harter admitted that Haldol does have some adverse side effects. He stated that G.M. is most concerned that he will develop Tardive Dyskinesia, which is a side effect that often occurs after extensive long term use of Haldol. Tardive Dyskinesia causes "slow, writhing, snake-like movements of the hands, fingers, tongue, mouth." (R. 39). Nonetheless, G.M. has taken Haldol in the past and there has been no indication that he has any symptoms of Tardive Dyskinesia. Moreover, it is Dr. Harter's position that the benefits of taking Haldol outweigh the risks to G.M.
Shockey also testified at the hearing. Shockey stated that she witnessed a lot of delusional thinking by G.M. She further testified that G.M. contacted her and stated that he wished to go to the Transitional Care Facility because he felt suicidal and "just generally out of it." (R. 54).
Finally, the trial court heard G.M. He testified that much of the testimony by Dr. Harter and Shockey was erroneous. He also testified that most of his family, at one time or another, worked at Eli Lilly and Company and that he knows when he needs medication and when he does not.
After hearing all of the evidence, the trial court found that G.M. is "gravely disabled and is a danger to himself." (R. 21). The court further held that he is in need of commitment to an appropriate facility for a period expected to exceed ninety (90) days. Finally, the trial court stated that G.M.'s condition will deteriorate if he does not receive medication regularly. Thus, the trial court ordered an involuntary regular commitment for G.M. and ordered medication with or without his consent. G.M. now appeals.

DISCUSSION AND DECISION

I. Involuntary Commitment

We deal first with whether the evidence was sufficient to support the trial court's finding that G.M. should be involuntarily committed. When reviewing a challenge to sufficiency of the evidence, we *1151 look to the evidence most favorable to the trial court's decision and all reasonable inferences drawn therefrom. Commitment of J.B. v. Midtown Mental Health Center, 581 N.E.2d 448, 449 (Ind.Ct.App. 1991). If the trial court's commitment order represents a conclusion that a reasonable person could have drawn, the order must be affirmed, even if other reasonable conclusions are possible. Id. at 449-450.
Additionally, in involuntary commitment cases, Ind.Code § 12-26-2-5(e)(1)(2) requires the petitioner to prove by clear and convincing evidence that: "(1) the individual is mentally ill and either dangerous or gravely disabled; and (2) detention or commitment of that individual is appropriate." G.M. does not challenge the trial court's determination that he is mentally ill; rather, he contests its determination that he is "gravely disabled."
Ind.Code § 12-7-2-96 defines "gravely disabled" as:
a condition in which an individual, as a result of mental illness, is in danger of coming to harm because the individual:
(1) is unable to provide for that individual's food, clothing, shelter, or other essential human needs; or
(2) has a substantial impairment or an obvious deterioration of that individual's judgment, reasoning, or behavior that results in the individual's inability to function independently.
In the petition for involuntary commitment as well as at the involuntary commitment hearing, both Dr. Harter and Shockey indicated that G.M. does not eat well and is often covered in vomit and his own excrement. Furthermore, the testimony of Harter and Shockey also indicated that G.M. may be a danger to himself and others. Ind.Code § 12-7-2-53 defines "dangerous" as: "a condition in which an individual as a result of mental illness, presents a substantial risk that the individual will harm the individual or others." As previously stated, both Shockey and Harter maintained that G.M. has suicidal and homicidal ideations.
In response, G.M. claims that although he has temporary lapses into behavior that seemingly can be defined as "gravely disabled," he does function independently. He testified that "I do quite well at feeding myself." (R. 63). G.M. also stated: "If I had wanted to I had all kinds of ways to destroy myself if I had actually wanted to do that." (R. 68).
In Commitment of J.B., 581 N.E.2d at 450, this court discussed the following:
In Addington v. Texas (1979), 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323, the United States Supreme Court expressed a strong concern that a decision ordering an involuntary commitment might be made on the basis of a few isolated instances of unusual conduct which occurred within a range of conduct which is generally acceptable. The Court opined that since everyone exhibits some abnormal conduct at one time or another, "loss of liberty calls for a showing that the individual suffers from something more serious than is demonstrated by idiosyncratic behavior." Id., 441 U.S. at 427, 99 S.Ct. at 1810.
G.M. has been suffering from mental illness since the age of 14. He has been hospitalized many times due to mental illness. The petition for involuntary commitment does not stem from an isolated incident. In the petition and at the hearing, the State presented evidence from sources that have examined him and spent a significant amount of time with him. This evidence has shown that as a result of his mental illness, G.M. is "gravely disabled" and "dangerous" and that involuntary commitment is appropriate. See Ind.Code § 12-26-2-5(e)(1)(2). Consequently, we find that the State provided clear and convincing evidence to warrant the involuntary commitment of G.M. Furthermore, we find that the trial court's commitment order represents a conclusion that a reasonable person could have drawn. See *1152 Commitment of J.B., 581 N.E.2d at 449-450.

II. Forced Medication

Next, G.M. argues that the trial court was incorrect in finding that the State's evidence was sufficient to override his right to refuse treatment with anti-psychotic medication. We disagree.
In In re Mental Commitment of M.P., 510 N.E.2d 645, 647-648 (Ind.1987), our supreme court held:
In order to override a patient's statutory right to refuse treatment, the State must demonstrate by clear and convincing evidence that: 1) a current and individual medical assessment of the patient's condition has been made; 2) that it resulted in the honest belief of the psychiatrist that the medications will be of substantial benefit in treating the condition suffered, and not just in controlling the behavior of the individual; 3) and that the probable benefits from the proposed treatment outweigh the risk of harm to, and personal concerns of, the patient. At the hearing, the testimony of the psychiatrist responsible for the treatment of the individual requesting review must be presented and the patient may present contrary expertise.
Equally basic to court sanctionable forced medications are the following three limiting elements. First, the court must determine that there has been an evaluation of each and every other form of treatment and that each and every alternative form of treatment has been specifically rejected. It must be plain that there exists no less restrictive alternative treatment and that the treatment selected is reasonable and is the one which restricts the patient's liberty the least degree possible. Inherent in this standard is the possibility that, due to the patient's objection, there may be no reasonable treatment available. This possibility is acceptable. The duty to provide treatment does not extend beyond reasonable methods. Second, the court must look to the cause of the commitment. Some handicapped persons cannot have their capacities increased by anti-psychotic medication. The drug therapy must be within the reasonable contemplation of the committing decree. And thirdly, the indefinite administration of these medications is not permissible. Many of these drugs have little or no curative value and their dangerousness increases with the period of ingestion. The court must curtail the time period within which they may be administered. If a patient does not substantially benefit from the medication, it should no longer be administered.
At the hearing, Dr. Harter testified that he examined G.M. He further testified that based on his training and experience, G.M. would substantially benefit from taking anti-psychotic medications, including, but not limited to, Haldol. Finally, Dr. Harter stated that despite the possible side effects of Haldol, its benefits to G.M. outweigh the risks.
Furthermore, Dr. Harter discussed a treatment plan for G.M. Harter discussed various medications and which would best serve G.M. He determined that Haldol, along with an antidepressant, would be the best treatment. Harter stated that his treatment plan would "reduce his [G.M.'s] delusions to the extent that he would be able to live more independently and help him, not ensure, but to help keep him out of the hospital." (R. 38). Additionally, Harter stated that his proposed treatment plan would help prevent G.M.'s suicidal tendencies. Finally, Dr. Harter did not indicate that G.M. should be on this proposed treatment plan indefinitely, nor did the court order G.M. to be forcibly medicated for an indefinite period.
G.M.'s concerns about taking Haldol have not been substantiated. He has not presented any evidence indicating that he has suffered any substantial side effects from taking Haldol in the past, nor has he rebutted Dr. Harter's conclusion that the benefits of taking Haldol outweigh the *1153 risks. Consequently, we find that the State presented clear and convincing evidence sufficient to override G.M.'s right to refuse treatment with anti-psychotic medication. See In re Mental Commitment of M.P., 510 N.E.2d at 647-648.

CONCLUSION
Based on the foregoing, we conclude that the trial court properly ordered the involuntary commitment of G.M. for a period to exceed ninety days at the Center for Behavioral Health, in Bloomington, Indiana. We also conclude that the trial court properly ordered G.M. to be medicated with or without his consent.
Affirmed.
ROBB, J., and DARDEN, J., concur.