
FILED

Feb 26 2015, 9:03 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Jill M. Acklin
McGrath, LLC
Carmel, Indiana

ATTORNEYS FOR APPELLEE

Jenny R. Buchheit
Stephen E. Reynolds
Ice Miller LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Civil Commitment of R.P.,

*Appellant-Respondent,*

v.

Optional Behavior MHS,

*Appellee-Petitioner.*

February 26, 2015

Court of Appeals Case No. 49A05-1405-MH-240

Appeal from the Marion Superior Court,

The Honorable Gerald S. Zore, Judge.

Cause No. 49D08-1404-MH-13949

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Respondent, R.P.,[1] appeals the trial court's Order of involuntary mental health commitment for a period not to exceed ninety days.

We affirm.

## ISSUE

R.P. raises one issue on appeal, which we restate as follows: Whether the trial court erred by finding that clear and convincing evidence established that R.P. presented a danger to others or was gravely disabled, thereby justifying an involuntary mental health commitment not to exceed ninety days pursuant to Ind. Code § 12-26-6-1.

## FACTS AND PROCEDURAL HISTORY

On April 23, 2014, after receiving a report from R.P.'s sister, police officers were sent to check up on R.P. Earlier that month, R.P. had refused his monthly injection of Invega to treat his mental illness. After locating R.P. in his apartment, which was in disarray, the officers escorted him to the emergency room at Ball State Memorial Hospital because he appeared to be "paranoid," have "mental issues," and displayed "bizarre behaviors." (Transcript p. 6). Hospital staff described R.P. as "fearful," thinking "there

---

[1] At the commitment hearing, R.P. testified that he was in the process of changing his name to K.A. and as such, the transcript reflects that R.P. is referred to as K.A.. However, because the name change did not appear to be finalized yet at the time of the commitment hearing, we will identify the Appellant-Respondent as R.P.

were people after him," and needing "to acquire a firearm to protect himself." (Tr. p. 6). That same day, hospital staff filed an application for emergency detention of a mentally ill and dangerous person, accompanied by a physician's emergency statement. The application was approved by the Delaware County court.

[4] Early the following morning, R.P. was transferred to Options Behavioral Health System (Options) in Indianapolis, Indiana. At Options, R.P. was examined by Dr. Olaniyi Osuntokun (Dr. Osuntokun), who diagnosed him with "Schizoaffective Disorder/Chronic Paranoid Schizophrenia." (Appellant's App. p. 7). Dr. Osuntokun clarified that R.P.'s Schizoaffective Disorder was the Bi Polar Type and that R.P. had recently decompensated. He displayed paranoid delusions, some of which were of a "grandiose nature." (Tr. p. 7). R.P. believed himself to be employed in the Federal Service, expected to become president in November 2016, and believed to have children with multiple celebrities. He had episodes of mania and severe mood swings— "between very angry and becoming quite calm." (Tr. pp. 7-8). Although he did not feel "insane," R.P acknowledged hearing voices, seeing objects move, and feeling the presence of family members when he was alone. (Tr. p. 24). Because R.P. does not believe he has a mental illness, he has a conceded antipathy towards his medication, and is convinced that a multivitamin is the only medication needed.

[5] On April 28, 2014, Options filed a report following emergency detention and a physician's statement asserting that R.P. was suffering from a psychiatric

disorder, is dangerous to others, and is gravely disabled. In his statement, Dr. Osuntokun noted that R.P. "is paranoid and delusional. He believes he needs to obtain a firearm. He had threatened to shoot persons he believed were harassing him." (Appellant's App. p. 13). Because it opined that R.P. was in "need of custody, care, or treatment in an appropriate facility," Options petitioned the trial court to impose an involuntary temporary commitment, not to exceed ninety days. (Appellant's App. pp. 13-14).

On May 1, 2014, the trial court conducted a hearing on Options' petition. At the close of the evidence, the trial court held that R.P. was suffering from a mental illness that made him dangerous to others and made him gravely disabled. R.P. was found to be in need of custody, care, and treatment at Options for a period of time not to exceed ninety days.

R.P. now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Mootness*

R.P. appeals the trial court's involuntary commitment Order, which was issued on May 1, 2014, and set to expire ninety days later, *i.e.*, July 30, 2014. As such, R.P. has been released from Options. Therefore, this court cannot render effective relief to him. When a court is unable to render effective relief to a party, the case is deemed moot and usually dismissed. *In re Commitment of J.B.*, 766 N.E.2d 795, 798 (Ind. Ct. App. 2002). "Although moot cases are dismissed, Indiana courts have long recognized that a case may be decided on

its merits under an exception to the general rule when the case involves questions of 'great public interest.'" *In re Lawrance*, 579 N.E.2d 32, 37 (Ind. 1991). Typically, cases falling in the "great public interest" exception contain issues likely to recur. *Id.*

[9] Indiana statutory and case law affirm that the value and dignity of the individual facing commitment or treatment is of great societal concern. *In re Mental Commitment of M.P.*, 510 N.E.2d 645, 646 (Ind. 1987) (noting that the statute granting a patient the right to refuse treatment "profoundly affirms the value and dignity of the individual and the commitment of this society to insuring humane treatment of those we confine"). Moreover, for the ordinary citizen, commitment to a mental hospital produces "a massive curtailment of liberty" and thus "requires due process protection." *Addington v. Texas*, 441 U.S. 418, 425, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). The loss of liberty produced by an involuntary commitment is more than a loss of freedom resulting from the confinement. Commitment to a mental hospital "can engender adverse social consequences to the individual; . . . [w]hether we label this phenomena stigma or choose to call it something else . . . we recognize that it can occur and that it can have a very significant impact on the individual." *Id.* The *Addington* Court expressed concern that an involuntary commitment might be ordered on the basis of a few isolated instances of unusual conduct occurring within a range of conduct that is generally acceptable. *See id.* As everyone exhibits some abnormal conduct at one time or another, "loss of

liberty calls for a showing that the individual suffers from something more serious than is demonstrated by idiosyncratic behavior." *Id*.

[10] The instant case involves the proof necessary to establish that a person is dangerous or gravely disabled and in need of involuntary commitment. This issue is of great public importance and likely to recur; therefore, we will address R.P.'s claim on its merits.

## II. *Sufficiency of the Evidence*

[11] Not contesting his diagnosis of mental illness, R.P. solely contends that Options presented insufficient evidence to establish that he was dangerous to others or gravely disabled and that his commitment at Options was the least restrictive environment suitable for treatment. When reviewing a challenge to the sufficiency of the evidence, we look to the evidence most favorable to the trial court's decision and all reasonable inferences drawn therefrom. *In re Commitment of G.M.*, 743 N.E.2d 1148, 1150-51 (Ind. Ct. App. 2001). We consider three factors to determine whether the totality of the circumstances supports an involuntary commitment: "the gravity of the behavior leading to hospital admission, behavior in the hospital, and the relationship between problematic behaviors and the person's mental illness." *In re Commitment of T.K.*, 993 N.E.2d 245, 248 (Ind. Ct. App. 2013). If the trial court's commitment order represents a conclusion that a reasonable person could have drawn, the order must be affirmed, even if other reasonable conclusions are possible. *Commitment of G.M.*, 743 N.E.2d at 1151.

## 1. *Dangerous to Others*

[12]    "Dangerous" means "a condition in which an individual[,] as a result of mental illness, presents a substantial risk that the individual will harm the individual or others." I.C. § 12-7-2-53. "Dangerousness must be shown by clear and convincing evidence indicating that the behavior used as an index of a person's dangerousness would not occur but for that person's mental illness." *In re Commitment of C.A.*, 776 N.E.2d 1216, 1218 (Ind. Ct. App. 2002). In other words, abnormal risk-taking will not support a finding a person is dangerous as defined by statute, unless that risk-taking is caused by mental illness. *Commitment of J.B. v. Midtown Mental Health Ctr.*, 581 N.E.2d 448, 452 (Ind. Ct. App. 1991), *trans. denied*.

[13]    Analogizing his situation to *Matter of Commitment of Gerke*, 696 N.E.2d 416 (Ind. Ct. App. 1998), R.P. characterizes his quest to obtain a firearm for protection as nothing more than "a risky or dangerous choice in order to avoid a threatening situation," which does not rise to the level of dangerousness as defined in the statute. (Appellant's Br. p. 10) In *Gerke*, Gerke unilaterally decided to stop his medication for schizophrenia. *Id*. at 417. At some point thereafter, he called his mother and requested that she bring his checkbook to his apartment so he could purchase some soft drinks and milk. *Id*. When his mother arrived, Gerke discovered that she had already purchased the items. *Id*. Gerke became angry and damaged his mother's car. *Id*. at 417-18. Analyzing the situation, the *Gerke* court noted that "[a]lthough Gerke has a long history of making violent threats to family, there has never been a single episode in which these threats elevated

into any type of physical attack." *Id*. at 420. Nevertheless, we concluded that "Gerke's reaction to his confrontation with his mother is not the type of idiosyncratic, risky behavior which might fall within an acceptable range of conduct." *Id*. Finding that Gerke's mental illness exacerbated to where he now had "the capability to express his anger with physical violence," we concluded that Gerke "presented a substantial risk that he might harm others." *Id*. at 421.

[14] *Gerke* cautions that a trial court is not required to wait until harm has nearly or actually occurred before determining that an individual poses a substantial risk of harm to others. *Id*. at 421. We clarified that a commitment premised upon a trial court's prediction of dangerous future behavior, without prior evidence of the predicted conduct, was valid, and observed "[t]he old adage of 'the dog gets one bite' does not, and should not, apply in the context of commitment proceedings, despite the severe restrictions on liberty imposed by commitment to a mental facility." *Id*.

[15] Thus, although R.P., unlike *Gerke*, has no history of violence or using any firearms upon another individual, this does not preclude the trial court from finding that R.P. posed a substantial risk to others. At the commitment hearing, Dr. Osuntokun testified that he had diagnosed R.P. with Schizoaffective Disorder, and displaying grandiose paranoid delusions. R.P. suffered from mania and severe mood swings—"between very angry and becoming quite calm." (Tr. pp. 7-8). His treating physician explained that on multiple occasions, R.P. had threatened to purchase a gun and to "kill people." (Tr. p. 10). Even though R.P. had informed his doctor that "the people [were]

trying to put [him] in the hospital, and the people [were] trying to put [him] in jail," he could not name specific individuals. (Tr. p. 11). Because of his refusal to accept that he has a mental illness, R.P. initially refused his medication at Options, thinking he merely needed a multivitamin, and only became more compliant with his medication regime immediately prior to his commitment hearing. Although R.P. "somewhat relented on the idea that he needs to buy a firearm" on the day before the commitment hearing, his treating physician saw a "need to remain in the hospital for stabilization." (Tr. p. 12). Dr. Osuntokun opined that "the combination of the mental illness, especially delusions of paranoia, and his intent to obtain a firearm make him a serious threat to other people" and emphasized unequivocally that "as a result of his mental illness," R.P. is "a danger to others." (Tr. pp. 10, 11). Based on this evidence, a reasonable person could have concluded that R.P. posed a substantial risk of harm to others and, thus, was dangerous. Therefore, Options presented sufficient evidence to support the trial court's order.[2]

[16] 2. *Appropriateness of the Commitment*

[17] In order for a court to involuntarily commit an individual under Indiana Code section 12-26-2-5(e), the commitment must be appropriate. The determination

---

[2] Because we conclude that sufficient evidence was introduced to establish that R.P. was dangerous to others, we need not consider his argument that Options produced insufficient evidence to support the trial court's conclusion that he was gravely disabled. *See* I.C. § 12-16-2-5(e).

of whether an involuntary commitment is appropriate is fact-sensitive. *Commitment of S.T. v. Cmty. Hosp. N.*, 930 N.E.2d 684, 690 (Ind. Ct. App. 2010).

[18] The evidence reflects that prior to his admission to Ball State Memorial Hospital and Options, R.P. had unilaterally stopped his monthly injection of Invega, thinking he merely needed a multivitamin. His apartment was in disarray and he displayed poor personal hygiene.

[19] While at Options, he initially refused oral medication to treat his Schizoaffective disorder, relenting only immediately before his commitment hearing. He disagreed with Dr. Osuntokun's diagnosis of his mental illness, and lacked any "insight into his illness." (Tr. p. 9). Dr. Osuntokun testified that after R.P. started taking his medication, his behavior improved. *See In re Commitment of Heald*, 785 N.E.2d 605, 615 (Ind. Ct. App. 2003) (commitment was appropriate because Heald did not acknowledge her mental illness and refused to take medication, and there was no evidence that family was able to appropriately monitor her condition), *trans. denied*. Dr. Osuntokun asserted that, at this time, R.P.'s treatment plan was the "least restrictive treatment plan likely to bring about an improvement in his condition." (Tr. p. 14). The benefits of this proposed treatment plan outweighed any risk of harm to R.P. Therefore, we affirm the trial court, and find that a temporary commitment at Options was appropriate.

## CONCLUSION

Based on the foregoing, we conclude that the trial court properly ordered R.P.'s involuntary commitment because he presented a danger to others pursuant to I.C. § 12-26-6-1.

Affirmed.

Vaidik, C. J. and Baker, J. concur