## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 05 2015, 11:41 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Valerie K. Boots
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Chadwick C. Duran
U.S. Department of Veterans Affairs
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Civil Commitment of R.J., <br><br> *Appellant-Respondent,* <br><br> v. <br><br> Richard L. Roudebush Veterans Affairs Medical Center, <br><br> *Appellee-Petitioner,* | June 5, 2015 <br><br> Court of Appeals Case No. 49A04-1411-MH-539 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Gerald Zore, Judge <br><br> Case No. 49D08-1410-MH-33327 |

**Vaidik, Chief Judge.**

# Case Summary

[1] R.J. appeals from the Marion Superior Court's order involuntarily committing him to the Richard L. Roudebush Veterans Affairs Medical Center (VAMC). He contends that his involuntary commitment is not supported by clear and convincing evidence. Specifically, he disputes the trial court's determination that: 1) he was mentally ill; 2) he was a danger to himself; and 3) his commitment to VAMC was appropriate. But the record shows that R.J., who was suffering from major depressive disorder, attempted suicide twice in the three months before his commitment, and was threatening to shoot himself with a handgun on the night before his commitment. At the commitment hearing, R.J.'s doctor testified that his commitment was absolutely necessary due to his suicidal history. This evidence is sufficient to support the trial court's involuntary-commitment order. We affirm.

# Facts and Procedural History

[2] R.J. is a medical doctor and veteran of the United States Air Force. After his military service—which included a three-month deployment to Iraq—ended, R.J. practiced medicine at several federal prisons in Texas. R.J. had difficulty sleeping and took medication for depression. Tr. p. 52.

[3] R.J.'s wife filed for divorce in summer 2014. *Id.* at 36. In July 2014 R.J. attempted suicide by consuming six bottles of opiates. *Id.* at 7, 39. He "very nearly died" and was on a ventilator for three days. *Id.* When he recovered,

R.J. moved to Indiana to be near family. He began working at Rockville Correctional Facility, but he was fired a short time later. On September 24, 2014, R.J. was treated at an urgent-care facility for suicidal ideations after expressing his plan to drive his car into a river. *Id.* at 7. Four days later, R.J. was hospitalized for three days after he took "too many pills." *Id.* at 7, 28, 42.

[4] On the evening of Saturday, October 18, 2014, R.J. was having "some intense emotions" about his wife and young son. *Id.* at 50. R.J. was "feeling down" and "firing a shotgun" into nearby woods. *Id.* at 51. He later went to a bar, where he began sending text messages to family members, including his stepfather, saying that "the gun was too long, couldn't do the job," and "I'm going to use a handgun either to the head, or to my chest." *Id.* at 41. His stepfather went to the bar to speak to R.J., who was "drinking heavily." *Id.* R.J. refused to speak to his stepfather, and R.J. left the bar in his car, driving "a 100 mile[s per] hour." *Id.* Police later located R.J. and took him to Terre Haute Regional Hospital.

[5] On Sunday, October 19, 2014, a hospital social worker completed an Application for Emergency Detention of Mentally Ill and Dangerous Person. Appellant's App. p. 17-18. The application was accompanied by a statement from Dr. Surjit Singh. *Id.* at 18. Dr. Singh asserted that R.J. was "at a high risk of committing suicide, multiple attempts [and] has intention of suicide completion by handgun." *Id.* R.J. was then transferred to VAMC, and VAMC employees filed the emergency-detention application on Monday, October 20, 2014.

[6]     Upon his arrival at VAMC, R.J. was examined by two physicians—Susan Conroy and Paula Mathewson. Dr. Conroy completed a Report Following Emergency Detention. *Id.* at 20-24. The report indicated that R.J. suffered from major depressive disorder and posed a substantial risk to himself because he "made several serious suicide attempts in the past month and states his intention to kill himself as soon as he is let out of the hospital." *Id.* at 22-23.

[7]     The trial court held a commitment hearing on October 28, 2014. Dr. Conroy testified that when R.J. came to VAMC, he refused to eat or drink for two days, and would not speak to any staff. Tr. p. 6. Dr. Conroy diagnosed R.J. with major depressive disorder based on "the thoughts of death and suicide, trouble sleeping. Um kind of feelings of guilt[] about things that have gone wrong, those are all symptoms of depression." *Id.* at 10. She testified about R.J.'s previous suicide attempts and explained that R.J.'s divorce was "probably the main trigger for all of this." *Id.* at 7. Dr. Conroy planned to treat R.J. with psychotherapy but believed that inpatient treatment was "absolutely necessary," and that she "had no choice[] but to commit him . . . we seriously believed that he [would] commit suicide." *Id.* at 8.

[8]     At the conclusion of the hearing, the trial court ordered R.J. committed to VAMC's custody for a period not to exceed ninety days.[1] In its written order,

---

[1] R.J.'s involuntary-commitment term has expired, and he has been released from VAMC's custody. Generally, we dismiss cases that are moot, but a moot case may be decided on its merits when it involves questions of great public interest, such as involuntary commitment, that are likely to recur. *A.L. v. Wishard*

the court found that R.J. was "suffering from major depressive disorder, which is a mental illness as defined in [Indiana Code section] 12-7-2-130," and was a danger to himself as defined by statute. Appellant's App. p. 20.

R.J. now appeals.

# Discussion and Decision

R.J. argues that his involuntary commitment is not supported by clear and convincing evidence. Specifically, he disputes the trial court's determination that: 1) he was mentally ill; 2) he was a danger to himself; and 3) his commitment was appropriate.

In Indiana, a person may be involuntarily committed if the petitioner proves by clear and convincing evidence that: "(1) the individual is mentally ill and either dangerous or gravely disabled; and (2) detention or commitment of that individual is appropriate." Ind. Code § 12-26-2-5(e). "[T]he purpose of civil commitment proceedings is dual: to protect the public and to ensure the rights of the person whose liberty is at stake." *In re Commitment of T.K.*, 27 N.E.3d 271, 273 (Ind. 2015) (citation omitted). "The liberty interest at stake in a civil commitment proceeding goes beyond a loss of one's physical freedom, and given the serious stigma and adverse social consequences that accompany such

*Health Servs., Midtown Cmty. Mental Health Ctr.*, 934 N.E.2d 755, 758 (Ind. Ct. App. 2010), *trans. denied.* We therefore consider R.J.'s appeal on the merits.

physical confinement, a proceeding for an involuntary civil commitment is subject to due process requirements." *Id.* (citing *Addington v. Texas*, 441 U.S. 418, 425-26 (1979)). The clear-and-convincing standard "not only communicates the relative importance our legal system attaches to a decision ordering an involuntary commitment, but . . . also has the function of reducing the chance of inappropriate commitments." *Id.* (citation omitted). When reviewing a challenge to the sufficiency of the evidence with respect to a commitment proceeding, we will affirm if, "considering only the probative evidence and the reasonable inferences supporting it, without weighing evidence or assessing witness credibility, a reasonable trier of fact could find [the necessary elements] proven by clear and convincing evidence." *Id.*

## 1. Mental Illness

[12] R.J. first challenges the trial court's determination that he was mentally ill. *See* Appellant's App. p. 14-16. Indiana Code section 12-7-2-130 defines mental illness as "a psychiatric disorder that . . . substantially disturbs an individual's thinking, feeling, or behavior . . . and impairs the individual's ability to function." Ind. Code § 12-7-2-130(1).

[13] Dr. Conroy diagnosed R.J. with major depressive disorder, characterized by "the thoughts of death and suicide, trouble sleeping. Um kind of feelings of guilt[] about things that have gone wrong, those are all symptoms of depression." Tr. p. 10. R.J. does not dispute that major depressive disorder is a mental illness as defined by statute. Rather, he disputes the accuracy of Dr.

Conroy's diagnosis by noting that she only recently graduated from medical school, spent only twenty minutes each day with him during his hospitalization, and only testified about four symptoms of major depressive disorder, despite the fact that "major depressive disorder requires a minimum of five symptoms of depression." Appellant's App. p. 14.

[14] With respect to Dr. Conroy's qualifications and the amount of time she spent with R.J. before diagnosing him, these issues go to the doctor's credibility—an issue to be determined by the trier of fact, not this Court. As for the fact that Dr. Conroy cited four, not five, symptoms of major depressive disorder, this is not reversible error. Section 12-7-2-130 does not require enumeration of a specific number of mental-illness symptoms before a trial court may find that an individual is mentally ill. Here, Dr. Conroy's testimony about R.J.'s suicidal history, thoughts of death and suicide, trouble sleeping, and feelings of guilt was sufficient. Although R.J. claims that some of his symptoms, such as difficulty sleeping, predated his hospitalization and thus are not reliable indicators of major depressive disorder, this is an invitation to reweigh the evidence, which we may not do. The trial court did not err in concluding that R.J. was mentally ill.

## 2. Dangerousness

[15] R.J. next challenges the trial court's conclusion that he was dangerous at the time of the commitment hearing. For involuntary-commitment purposes, "dangerous" is defined as "a condition in which an individual as a result of

mental illness, presents a substantial risk that the individual will harm the individual or others." Ind. Code § 12-7-2-53. "Dangerousness must be shown by clear and convincing evidence indicating that the behavior used as an index of a person's dangerousness would not occur but for that person's mental illness." *In re Commitment of C.A.*, 776 N.E.2d 1216, 1218 (Ind. Ct. App. 2002).

[16] Here, R.J.'s behavior strongly supports the trial court's determination that he was dangerous: in the three months leading up to his commitment, R.J. attempted suicide twice by consuming pills, and he was also treated at an urgent-care facility for suicidal ideations after expressing his plan to drive his car into a river. On the night before he was committed, R.J. was "feeling down" and "firing a shotgun" into nearby woods. Tr. p. 51. He later went to a bar, where he began sending text messages to family members, including his stepfather, saying that "the gun was too long, couldn't do the job," and "I'm going to use a handgun either to the head, or to my chest." *Id.* at 41. His stepfather went to the bar to speak to R.J., who was "drinking heavily." *Id.* R.J. refused to speak to his stepfather, and R.J. left the bar in his car, driving "a 100 mile[s per] hour." *Id.* This is sufficient evidence that R.J. posed a substantial risk of harm to himself and thus, was dangerous.

[17] R.J. argues that the trial court found only that he *might* pose a danger to himself. *See* Appellant's Br. p. 17-18. R.J.'s claim is based on the trial court's comment at the conclusion of the commitment hearing that "[R.J.] maybe [sic] dangerous to himself . . . ." Tr. p. 67. But as R.J. acknowledges, the trial

court's commitment order clearly states its finding that "[R.J.] is dangerous to self . . . ." Appellant's App. p. 7. From this we can conclude that the trial court made the statutorily required finding that R.J. was dangerous.

# 3. Appropriateness

[18] Finally, R.J. challenges the appropriateness of his commitment to VAMC. In order for a court to involuntarily commit an individual under Indiana Code section 12-26-2-5(e), the commitment must be appropriate. The determination of whether an involuntary commitment is appropriate is fact-sensitive. *In re Commitment of R.P.*, 26 N.E.3d 1032, 1037 (Ind. Ct. App. 2015) (citation omitted).

[19] Here, the record clearly establishes R.J.'s suicidal history. After diagnosing R.J. with major depressive disorder, Dr. Conroy developed a plan to treat him with psychotherapy. Tr. p. 7. At the commitment hearing she stated that she believed that inpatient treatment was "absolutely necessary," and that she "had no choice[] but to commit him . . . we seriously believed that he [would] commit suicide." *Id.* at 8. On appeal, R.J. argues that he could have participated in psychotherapy in an outpatient setting, which would have allowed him to stay abreast of his divorce proceedings and ongoing job search. *See* Appellant's App. p. 12-14. R.J. also contends that "the record shows that [he] was no longer suicidal." *Id.* at 14. But in light of R.J.'s repeated suicide attempts and his doctor's unequivocal opinion that he would in fact commit

suicide if not committed, we cannot say that the trial court erred in determining that R.J.'s temporary commitment to VAMC was appropriate.

Affirmed.

Kirsch, J., and Bradford, J., concur.