

**FILED**

May 30 2025, 9:37 am

**C L E R K**
Indiana Supreme Court
Court of Appeals
and Tax Court

I N T H E

# Court of Appeals of Indiana

In re Commitment of D.W.,

*Appellant-Respondent*

v.

IU Health Methodist Hospital,

*Appellee-Petitioner*

---

May 30, 2025

Court of Appeals Case No.
24A-MH-2284

Appeal from the Marion Superior Court

The Honorable David Certo, Judge

Trial Court Cause No.
49D08-2408-MH-38537

---

**Opinion by Judge DeBoer**
Judges Bailey and Vaidik concur.

**DeBoer, Judge.**

## Case Summary

[1] D.W. appeals the trial court's order committing him to IU Health Methodist Hospital (IU Methodist) for a period expected to exceed ninety days. D.W. raises one issue, which we restate as whether there is sufficient evidence to support the court's order for a regular commitment. We affirm.

## Facts and Procedural History

[2] On August 21, 2024, D.W., a forty-six-year-old male, voluntarily admitted himself to IU Methodist after he experienced increased anxiety, feelings of paranoia, and worsening thoughts of suicide. The emergency department initiated a forty-eight-hour emergency detention of D.W. On August 23, IU Methodist filed a petition for the regular involuntary commitment of D.W. and an accompanying physician's statement, the latter of which specifically requested state hospitalization. On August 29, a video hearing was held to address the petition.

[3] At the hearing, Dr. Jonathan Withers, a psychiatrist with IU Methodist, testified that he had examined D.W. before his admission on August 21 and six times since then. The doctor's "working diagnosis" for D.W. was bipolar disorder, and he believed D.W.'s current episode was "depressed or mixed with

psychotic features[.]"[1]  Transcript at 9.  The day before the hearing, D.W. described "ongoing suicidal thoughts" to Dr. Withers and said that he "see[s] suicide as a solution[.]"  *Id.* at 27.  Dr. Withers testified that D.W. presented a "very high" risk of suicide if his commitment was not ordered.  *Id.* at 36.

[4]  Dr. Withers discussed how D.W. had spent seventy to eighty nonconsecutive days hospitalized the year before his detention.  D.W. had overdosed four times and, on another occasion, he "intentionally crash[ed] his car into a pole" when his wife was in the car with him.  *Id.* at 14.  He was hospitalized after each of these incidents.  In a separate demonstration of dangerous behavior, D.W. "lit a pillow on fire in [his] garage[.]"  *Id.*

[5]  D.W. was first admitted to IU Methodist in May 2024 after his wife found him "combining Nyquil, Carisoprodol the muscle relaxer, and Ambien a sleep aid in the blender."  *Id.*  Although he voluntarily entered a residential treatment program, he left it after only a few days.  On July 10, D.W. was admitted to IU Methodist with "suicidal ideation and agitation[.]"  *Id.*  During this admission, and in consultation with Dr. Withers, D.W. decided to try electroconvulsive therapy (ECT).  Dr. Withers explained that ECT can be "very [e]ffective for depression, mania, [] mixed states," mood episodes, and psychotic symptoms.  *Id.* at 15.  D.W. received inpatient ECT treatments over ten days and then

---

[1] Dr. Withers testified the bipolar diagnosis was "chronic" because D.W. told him he was first diagnosed in his twenties, but Dr. Withers' personal diagnosis was a "working" one because D.W. had not yet displayed a "full on pure manic episode."  Transcript at 9.

continued with outpatient ECT. Dr. Withers testified that initially D.W. showed improvement, but during an August 12 visit, he complained he was having "significant worsening of thoughts of suicide" and "paranoid ideations." *Id.* On August 16, D.W. received an ECT treatment, but he felt "immediately more restless" upon leaving the hospital. *Id.* at 16. He voluntarily admitted himself on August 21.

[6] Dr. Withers shared that D.W. experienced a "significant back injury" in his early twenties that required surgery. *Id.* at 17. Since then, D.W. had been prescribed many "habit forming and addictive" medications for chronic pain and sleep issues.[2] *Id.* Back in July 2023, D.W. abruptly stopped taking these medications and experienced increased mental health symptoms, including "hallucinations, having poor focus, ideas of reference and auditory hallucinations." *Id.* at 36. D.W.'s primary care physician had him resume taking the medications, but his symptoms did not significantly improve. Accordingly, Dr. Withers testified that he was concerned D.W. was experiencing bipolar disorder "compounded by decades of . . . hospital induced chemical dependence on opioid and sedative hypnotics[.]" *Id.* at 18.

[7] Dr. Withers laid out his anticipated treatment plan for D.W., which involved gradually reintroducing substances to which D.W.'s "brain ha[d] built up a dependence" and then tapering D.W. back off those substances. *Id.* The doctor

---

[2] These medications included Hydrocodone, Carisoprodol, Zolpidem, Gabapentin, Tramadol, and Adderall.

planned to use medications tailored specifically to D.W.'s diagnostic impression, including an opioid, gamma-aminobutyric acid (GABA) modulator, sleep aid, anti-psychotic, mood stabilizer, and anti-depressant. The plan required a "controlled setting" where D.W. could be "monitored closely" for "a number of months[,]" which is why Dr. Withers felt that a regular commitment with state hospitalization was the least restrictive treatment setting. *Id.* at 19. Dr. Withers testified that a temporary commitment would not be sufficient because of D.W.'s extensive recent hospitalizations, and it would be "[un]wise to treat this as though it's something we will be able to completely resolve within . . . three months." *Id.* at 20. Due to the risk of overdose, Dr. Withers stated that he would be "hesitant to prescribe this treatment plan" if a less restrictive setting were ordered. *Id.* at 23.

[8] D.W. also testified at the commitment hearing. He did not dispute that he had a mental illness and he had attempted suicide multiple times in the past year, and he expressed a desire to receive treatment and improve his condition. He disagreed, however, with the necessity of a regular commitment and state hospitalization. He did not think the ninety-plus-day timeline was "realistic[.]" *Id.* at 53. D.W. was concerned about the financial strain his family would suffer if he were committed as proposed because he was currently on unpaid, short-term disability leave as a driver for UPS and had "[v]ery little" money saved. *Id.* at 39. D.W. testified that he was against state hospitalization in part because he was "comfortable with the doctors" at IU Methodist. *Id.* at 41. In

fact, D.W. thanked Dr. Withers and said the doctor's team had "saved [his] life, literally." *Id.* at 42.

[9]     The trial court granted IU Methodist's request for a regular commitment, finding that D.W. suffered from "bi-polar disorder, depressed, with psychosis," and he was dangerous to himself and gravely disabled.  Appellant's App. Vol. 2 at 10.  The trial court declined to order state hospitalization but left the possibility open if the circumstances changed.  The court found that D.W. needed "custody, care, and treatment at IU Methodist Hospital for a period of time expected to exceed ninety (90) days." *Id.*  The trial court's order specifically noted:

> [D.W.] is gravely disabled in his judgment and reasoning and dangerous to self, as yesterday he told Dr. Withers he was suicidal and sees suicide as a solution.  He has been hospitalized in psychiatric crisis more than 80 days in the last year, and Dr. Withers testifies [D.W.] has high risk of suicide if released. Hospital shall notify court if pursuing State Hospital admission and expected wait time, if any.

*Id.* at 11.

## Discussion and Decision

[10] D.W.'s sole argument is that there is insufficient evidence to show that his involuntary regular commitment was appropriate.[3] Specifically, the trial court found that D.W.'s placement at IU Methodist for a period expected to exceed ninety days was the "least restrictive environment suitable for treatment and stabilization as well as protecting [D.W.] while restricting [D.W.'s] liberty to the least degree possible." *Id.* at 10.

[11] When reviewing the sufficiency of the evidence supporting an involuntary civil commitment, we consider only the probative evidence and the reasonable inferences supporting the judgment and do not reweigh the evidence or reassess witness credibility. *Civil Commitment of T.K. v. Dep't of Veterans Affs.*, 27 N.E.3d 271, 273 (Ind. 2015). Involuntary civil commitment proceedings implicate significant liberty interests and are therefore subject to due process requirements. *Id.* To satisfy these requirements, the facts justifying an involuntary commitment must be proven by clear and convincing evidence. *Id.* We will affirm if a reasonable trier of fact could find the necessary elements were proven by clear and convincing evidence. *Id.*

[12] To obtain the involuntary regular commitment of an individual, a petitioner must prove that: "(1) the individual is mentally ill and either dangerous or

---

[3] D.W. does not dispute the trial court's findings that he was mentally ill, dangerous to himself, and gravely disabled. He also does not contest the trial court's order for him to take all prescribed medications. D.W.'s argument focuses only on the length of his commitment.

gravely disabled; and (2) detention or commitment of that individual is appropriate." Ind. Code § 12-26-2-5(e). Regular commitments are the most restrictive form of involuntary treatment and are proper for individuals "whose commitment is reasonably expected to require custody, care, or treatment in a facility for more than ninety (90) days." I.C. § 12-26-7-1; *In re Commitment of A.W.D.*, 861 N.E.2d 1260, 1264 n.3 (Ind. Ct. App. 2007), *trans. denied*. Indiana also has procedures for "emergency" commitments up to seventy-two hours, and "temporary" commitments up to ninety days. *See* I.C. chs. 12–26–5 and 12–26–6. "The determination of whether an involuntary commitment is appropriate is fact-sensitive." *R.P. v. Optional Behav. MHS*, 26 N.E.3d 1032, 1037 (Ind. Ct. App. 2015).

[13] The evidence reflects that D.W. spent seventy to eighty days of the past year hospitalized due to his mental health, multiple suicide attempts, and other incidents of "dangerous behaviors[.]" Tr. at 15. One such hospitalization came after D.W. "intentionally crash[ed] his car into a pole" while his wife was his passenger. *Id.* at 14. Dr. Withers testified that D.W. would be at "very high" risk of suicide if he was not involuntarily committed. *Id.* at 36. In fact, the very day before the commitment hearing, D.W. described his "ongoing suicidal thoughts" to Dr. Withers and said that he "see[s] suicide as a solution." *Id.* at 27. To the doctor, D.W.'s severe symptoms suggested that his mental illnesses were being compounded by the effects of long-term chemical dependency and his abrupt withdrawal from the substances causing that dependency. Thus, D.W.'s treatment plan was designed to account for this confluence of factors.

[14] Dr. Withers stated it would be unwise to treat D.W. as though his condition could be resolved within ninety days. Because voluntary residential treatment and "intensive outpatient therapy" had been tried and failed, the doctor felt D.W. required "prolonged admission" in a "controlled setting" to safely effectuate the proposed treatment plan. *Id.* at 19. This evidence supports a finding that the regular commitment of D.W. was appropriate.

[15] We also note that the trial court did not simply adopt Dr. Withers' recommendation in its entirety. The doctor testified that a regular commitment with the special condition of state hospitalization would be the least restrictive setting for treating D.W, but instead the court ordered D.W.'s regular commitment to IU Methodist, where D.W. was "comfortable with the doctors" who had "saved [his] life[.]" *Id.* at 41, 42. D.W.'s arguments, which detail his willingness to continue less restrictive treatment options and his fears regarding the financial consequences of a regular commitment, amount to requests for this Court to reweigh the evidence, which we will not do. *See T.K.*, 27 N.E.3d at 273.

## Conclusion

[16] Clear and convincing evidence supports the trial court's decision to order the regular commitment of D.W.

[17] Affirmed.

Bailey, J., and Vaidik, J., concur.

ATTORNEYS FOR APPELLANT

Talisha Renea Griffin
Ellen M. O'Connor
Marion County Public Defender Agency, Appellate Division
Indianapolis, Indiana


ATTORNEYS FOR APPELLEE

Jenny R. Buchheit
Sean T. Dewey
Ice Miller LLP
Indianapolis, Indiana