In the Matter of the COMMITMENT of J.B., Appellant–Respondent,

v.

MIDTOWN MENTAL HEALTH CENTER, Appellee– Petitioner.

No. 49A02–9102–CV–60 [1].

Court of Appeals of Indiana, Fifth District.

Nov. 19, 1991.

1. This case has been diverted to this office by order of the Chief Judge.

Katherine A. Cornelius, Bleecker Brodey & Andrews, Indianapolis, for appellant-respondent.

Peter H. Pogue, Locke Reynolds Boyd & Weisell, Indianapolis, for appellee-petitioner.

RUCKER, Judge.

J.B., a thirty-one year old female suffering from the mental disease of alcoholism, was involuntarily committed to Central State Hospital after the trial court determined she was dangerous to herself. On appeal J.B. challenges the commitment order arguing the trial court erred in its finding of dangerousness.

We reverse.

Since 1984, J.B. has undergone treatment for alcoholism. The treatment programs were not successful until 1987, when she underwent outpatient therapy. J.B. was demonstrating progress until the spring of 1990, when her ability to stay sober began to decline and her behavior became erratic.

By the summer of 1990, as a result of her alcohol abuse, J.B. had become unemployed, and had lost her apartment. Between June and October of 1990, J.B. was arrested on three separate occasions: once for driving while intoxicated, once for public intoxication, and once for public indecency.

During that same period, there were three instances in which J.B. was away from home and so intoxicated that her mother went out to retrieve her. On two of those occasions, J.B. initially appeared to acquiesce and went along with her mother's desire to take her home. On both of those occasions, however, J.B. waited until her mother had stopped the car at a busy intersection and then J.B. got out of the car and ran away through the traffic. On the third occasion, J.B. did not get into her mother's car but rather flagged down a car containing several young men and left in the car with them as her mother approached.

On October 16, 1990, J.B.'s mother submitted an application for J.B.'s emergency detention to Midtown Mental Health Center (Midtown). Midtown filed a physician's emergency statement with the trial court and on that date an emergency detention order was issued pursuant to Ind.Code § 16–14–9.1–7. While at Midtown, J.B. was examined by Dr. Celestine Detrana, a psychiatric resident at the hospital. Midtown petitioned for regular commitment of J.B. and a hearing was held on November 1, 1990.

At the hearing, Dr. Detrana testified that J.B. was mentally ill in that she was suffering from severe alcohol dependency. Dr. Detrana also testified that J.B.'s recent conduct was a manifestation of that illness, and that those manifestations of mental illness made J.B. dangerous to herself. Detrana further testified J.B. was unlikely to make any progress with her illness without a structured program.

The trial court found that J.B. was mentally ill and dangerous to herself, and entered an order for J.B.'s regular commitment to Central State Hospital. This appeal ensued.

## I.

A person may be involuntarily committed if the court finds by clear and convincing evidence that the person is mentally ill and either dangerous to herself or others or gravely disabled. Ind.Code § 16–14–9.1–3 and § 16–14–9.1–10; *Jones v. State* (1985), Ind.App., 477 N.E.2d 353, *trans. denied.*

Mental illness is defined as a "psychiatric disorder that substantially disturbs an individual's thinking, feeling, or behavior and impairs the individual's ability to function." Ind.Code § 16–14–9.1–1(a). J.B. does not contest the court's finding that she is mentally ill. J.B. argues, however, the evidence is insufficient to justify the court's finding that she is dangerous to herself.

When reviewing a challenge to sufficiency of the evidence we look to the evidence most favorable to the trial court's decision and all reasonable inferences drawn therefrom. If the trial court's commitment order represents a conclusion that a reasonable person could have drawn, then the order must be affirmed even if

other reasonable conclusions are possible. *In re Mental Commitment of M.P.* (1986), Ind.App., 500 N.E.2d 216, 219 *reh. denied, modified,* (1987), Ind., 510 N.E.2d 645.

"Dangerous" is defined by Ind.Code § 16–14–9.1–1(c) as "a condition in which an individual as a result of mental illness presents a substantial risk that the individual will harm the individual or others." J.B. argues the evidence of leaving her mother's car while stopped at an intersection and hitchhiking is not the sort of conduct envisioned by the statute as a basis for a finding of dangerous to self. J.B. also argues such evidence is far from clear and convincing that she is at substantial risk of harming herself in the future.

In contrast, Midtown contends J.B. exposed herself to substantial risk by running out into traffic at a busy intersection and flagging down a car containing several men. Midtown argues the demands of I.C. § 16–14–9.1–1(c) have been satisfied by the testimony of Dr. Detrana that the foregoing conduct is a manifestation of J.B.'s mental illness and that because of these manifestations J.B. is thereby a danger to herself.

Proceedings for an involuntary commitment are subject to federal due process requirements:

> We have recognized that for the ordinary citizen commitment to a mental hospital produces 'a massive curtailment of liberty' *Humphrey v. Cady,* 405 U.S. 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394 (1972), and in consequence 'requires due process protection.' *Addington v. Texas,* 441 U.S. 418, 425, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323 (1979); *O'Connor v. Donaldson,* 422 U.S. 563, 580, 95 S.Ct. 2486, 2496, 45 L.Ed.2d 396 (BURGER, C.J., concurring). The loss of liberty produced by an involuntary commitment is more than a loss of freedom from confinement. It is indisputable that commitment to a mental hospital 'can engender adverse social consequences to the individual' and that '[w]hether we label this phenomena "stigma" or choose to call it something else ... we recognize that it can occur and that it can have a very

significant impact on the individual.' *Addington v. Texas, supra,* [441 U.S.] at 425–426, 99 S.Ct., at 1809. See also *Parham v. J.R.,* 442 U.S. 584, 600, 99 S.Ct. 2493, 2503, 61 L.Ed.2d 101 (1979). Also '[a]mong the historic liberties' protected by the Due Process Clause is the 'right to be free from, and to obtain judicial relief for, unjustified intrusions on personal security.' *Ingraham v. Wright,* 430 U.S. 651, 673, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977).

*Vitek v. Jones* (1980), 445 U.S. 480, 491–492, 100 S.Ct. 1254, 1263, 63 L.Ed.2d 552, 564, quoted in *Matter of Tedesco* (1981), Ind.App., 421 N.E.2d 726, 729, *trans. denied.*

■ To satisfy the requirements of due process the State must prove the facts justifying an involuntary commitment by clear and convincing evidence. *In Re Turner* (1982), Ind.App., 439 N.E.2d 201; *Matter of Commitment of Linderman* (1981), Ind. App., 417 N.E.2d 1140. This standard of proof not only communicates the relative importance our legal system attaches to a decision ordering an involuntary commitment, but it also has the function of reducing the chance of inappropriate commitments.

In *Addington v. Texas* (1979), 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323, the United States Supreme Court expressed a strong concern that a decision ordering an involuntary commitment might be made on the basis of a few isolated instances of unusual conduct which occurred within a range of conduct which is generally acceptable. The Court opined that since everyone exhibits some abnormal conduct at one time or another, "loss of liberty calls for a showing that the individual suffers from something more serious than is demonstrated by idiosyncratic behavior." *Id.,* 441 U.S. at 427, 99 S.Ct. at 1810.

■ The concern expressed in *Addington* is well taken and applies equally to the inherently problematic determination of future dangerousness. It is beyond dispute that everyone exposes himself to risk now and again, and therefore a court must approach the determination of a mentally ill

person's dangerousness with some circumspection. Otherwise, the danger is strong, that a mentally ill person might be inappropriately committed. *Addington, supra.* There is no constitutional basis for confining a mentally ill person who is not dangerous and can live safely in freedom. *Linderman, supra.*

## II.

No Indiana case has elaborated on the parameters of "dangerous" as that term is defined in I.C. § 16–14–9.1–1(c).[2] However, involuntary commitment cases from foreign jurisdictions are instructive to our analysis. Those cases which have found clear and convincing evidence that a mentally ill person is dangerous to self have a unifying thread running through the underlying facts. Namely, the facts used to justify the commitment discount on their face the possibility that the conduct is an instance of everyday risk-taking behavior. *Matter of Gatson* (1979), 3 Kan.App.2d 265, 593 P.2d 423 (Individual went out into cold weather wearing no clothes or shoes.); *Matter of Wilson* (1983), Ala.Civ.App., 431 So.2d 552 (Individual would not eat or sleep for periods of up to 36 hours and lost 50 lbs. in 8 months.); *Matter of Samuels* (1986), D.C.App., 507 A.2d 150 (Individual would wander aimlessly through traffic on freeway ramp.); *Matter of Chey* (1985), Minn.App., 374 N.W.2d 778 (Individual would often fall while climbing out of windows and ran repeatedly into traffic.); *Matter of A.G.* (1984), Mont., 677 P.2d 592 (Individual jumped out of moving car.).

To put the matter another way, we believe that the factual circumstances of the foregoing cases lead inevitably to a conclusion that the conduct which is predictive of future dangerousness would not occur but for the individual's mental illness. For reasons that we now elaborate, we believe this is the relevant inquiry to our review of the present issue.

## III.

■ In making a determination of future dangerousness, the court must exercise extreme caution that it not utterly strip a person suffering from mental illness of the power to make an informed decision concerning risk-taking. "Erratic behavior in some areas of an individual's life does not necessarily render that person incapable of appreciating and making rational choices." *Colyar v. Third Judicial Dist. Court, Etc.* (1979, C.D.Utah), 469 F.Supp. 424, 430. If every idiosyncratic decision entailing some risk of harm made by a mentally ill person exposed him to the possibility of involuntary commitment, there would be an unacceptable risk that the individual is losing his liberty solely because he is afflicted with a mental illness requiring treatment. This is an impermissible result. *O'Connor v. Donaldson* (1975), 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (BURGER, C.J., concurring).

In other words, something more than a mere showing that a mentally ill person has taken a risk must be shown to justify an involuntary commitment. The foregoing concern is consistent with the statutory authority governing an involuntary commitment in Indiana. In order to determine that a person is dangerous to herself, the necessary risk of harm presented by that individual must be a result of her mental illness. I.C. § 16–14–9.1–1(c). The evidence must clearly and convincingly show that the person presents a substantial risk that he will harm himself as *a result* of a psychiatric disorder which substantially disturbs that person's thinking, feeling or behavior and impairs that person's abili-

---

**2.** Midtown argues that the Indiana standard for "dangerous to self" is met where the evidence supports a "reasonable expectation that the respondent would engage in dangerous conduct," quoting *F.J. v. State* (1980), Ind.App., 411 N.E.2d 372, 381–382. That language is dicta in *F.J.* and is based on a holding in an Illinois case, *In re Powell* (1980), Ill.App., 407 N.E.2d 658, 660. The holding in *Powell* directly tracks an Illinois statutory requirement for proof that a mentally ill person is a danger to self or others; the State of Illinois must show that the person "is *reasonably expected* at the time the determination is being made or within a reasonable time thereafter to intentionally or unintentionally physically injure himself or other persons." (Ill.Rev. Stat.1977, ch. 9½, par. 1–11 emphasis added). We decline to follow *Powell.*

ty to function. *See* Ind.Code § 16–14–9.1–1(a).

██ It follows from our statutory scheme that a person suffering from a mental illness may not be involuntarily committed based on a rational and informed decision to engage in conduct entailing a risk of harm. Therefore, we hold that the statutory standard can be met only with clear and convincing evidence indicating that the behavior used as an index of a person's dangerousness would not occur but for that person's mental illness. Any lesser standard would raise the risk of inappropriate commitments to a constitutionally unacceptable level. *O'Connor, supra; Linderman, supra.*

██ The evidence before the trial court in the present case falls short of the clear and convincing standard demanded by due process. The only probative evidence of J.B.'s dangerousness is the testimony concerning the two instances in which J.B. ran away through traffic at a busy intersection and one instance in which she hitchhiked.[3] It is undisputed that in each instance J.B.'s conduct was motivated, in part at least, by J.B.'s desire to escape the company of her mother. While J.B. may have made a choice that many members in our society would not think worth the risk, her conduct presents too slender a thread to support an involuntary commitment.

This is not a case like *Chey, supra,* in which the individual compulsively ran into traffic for no apparent reason, or *Samuels, supra,* in which the individual wandered about aimlessly through traffic on a freeway ramp. In both these cases the causal relationship of the person's mental illness to the dangerous conduct is apparent on its face. We do not believe that expert testimony stating that such a link exists would make the link between mental illness and conduct in these cases any more clear than would the factual circumstances alone.

In the present case, however, J.B. made a decision to put herself at risk by running away into traffic and hitchhiking in order to avoid her mother. There is no inherent showing in this conduct that it would not occur but for her mental illness. Standing alone, J.B.'s conduct does not form a sufficient basis for a determination that she is dangerous to herself.

We will not speculate as to whether appropriate expert testimony might have provided a sufficient basis to justify an involuntary commitment of J.B., based on the same conduct. We note, however, there was no expert testimony in this case demonstrating how J.B.'s conduct could be appropriately viewed as a product of a disturbance of thought, feeling or behavior and impaired function. Most notably, there was no expert testimony showing how the relationship of J.B.'s conduct and her mental illness formed a foundation for the prediction of future dangerousness.

Rather, the record only discloses bare pronouncements by Dr. Detrana that J.B.'s conduct constituted manifestations of her mental illness and those manifestations made her dangerous to herself. Dr. Detrana's testimony, standing alone, does not show that but for J.B.'s mental illness she would not have taken the risks. Without more, such evidence is not clear and convincing proof that J.B. is dangerous to herself within the meaning of I.C. § 16–14–9.1–1(c).

The judgment is reversed.

STATON, J., concurs.

SHARPNACK, J., dissents with opinion.

SHARPNACK, Judge, dissenting.

I respectfully dissent for I believe the majority has reweighed the evidence and created an incorrect standard for review of trial court determinations that an individual is mentally ill and dangerous to self.

There is no question that the elements necessary to support a commitment must be proved by clear and convincing evidence.

---

**3.** Midtown suggests that we may also appropriately consider testimony that J.B. had been physically assaulted in July of 1990 and had been raped several years earlier as proof that J.B. is dangerous to herself (Brief of Appellant at 14). Without additional evidence linking these events to J.B.'s alcoholism, such testimony is not relevant to our review.

There is no question that the person in question must be proved to be both:

1. mentally ill and
2. gravely disabled or dangerous.

I.C. § 16–14–9.1–3.

In order for a person to be found "mentally ill," it must be proved that the person has

a psychiatric disorder that substantially disturbs an individual's thinking, feeling, or behavior and impairs the individual's ability to function. The term includes any mental retardation, alcoholism, or addiction to narcotics or dangerous drugs.

I.C. 16–14–9.1–1(a).

In order for a person to be found "gravely disabled," it must be proved that the person has a condition

in which an individual, as a result of mental illness, is in danger of coming to harm because the individual:

(1) Is unable to provide for that individual's food, clothing, shelter, or other essential human needs; or

(2) Has a substantial impairment or an obvious deterioration of that individual's judgment, reasoning, or behavior that results in the individual's inability to function independently.

I.C. 16–14–9.1–1(b).

In order for a person to be found "dangerous," it must be proved that the person has a condition

in which an individual as a result of mental illness presents a substantial risk that the individual will harm the individual or others.

I.C. 16–14–9.1–1(c).

We deal with the review of a case decided on a "clear and convincing" standard as we do with a case decided on a "beyond a reasonable doubt" standard. When we review the evidence supporting such a judgment, we may neither reweigh the evidence nor judge the credibility of the witnesses. *Washington v. State* (1982), Ind., 441 N.E.2d 1355, 1358. Where the evidence is in conflict, we are bound to view only that evidence which is most favorable to the verdict and judgment of the trial court. *Id.* If there is any substantial evidence supporting the judgment, we must affirm. *Hutchinson v. State* (1985), Ind., 477 N.E.2d 850.

I agree that, in this case, it must have been shown by clear and convincing evidence that J.B. was dangerous to herself as a result of her particular mental illness—addiction to alcohol.[4] I also agree that there must have been some factual basis beyond the mere opinion of a physician that such was the case. However, I do not agree that the factual basis must have been some activity that in and of itself would demonstrate to a judge the causal connection between J.B.'s illness and her activity. I read the majority opinion to require just that.

The majority asserts that "J.B. made a decision to put herself at risk by running away into traffic and hitchhiking in order to avoid her mother. There is no inherent showing in this conduct that it would not occur but for her mental illness."[5] Further, while the action of J.B. is recognized by the majority to have put her "at risk", the majority does not find that, "[s]tanding alone ... [it] form[s] a sufficient basis for a determination that she is dangerous to herself." How is a court to make a judgment that conduct *standing alone* is demonstrative of a causal connection between

---

**4.** It is clear that this case would have been much easier to resolve if it had turned on a determination as to whether J.B. was gravely disabled. The record provides ample evidence that would support the conclusion that she was gravely disabled. Proceeding on a theory of dangerousness to self seems to have resulted from advice to the mother that nothing could be done about J.B. on an involuntary basis unless she was dangerous to herself or others. That is true for an emergency detention under I.C. § 16–14–9.1–7(a), but not for a temporary or regular commitment under I.C. § 16–14–9.1–8 or § 16–14–9.1–10.

**5.** Even if you accept, as did the majority, that J.B. jumped from her mother's car while stopped in traffic "to avoid her mother," there remains the permissible inference that the reason that she wanted to avoid her mother was to prevent her mother from interfering with her addiction to alcohol—that is, that her leaping from the car was a result of her addiction.

mental illness and behavior that creates risk of personal injury?

Whether or not particular behavior is a "result of mental illness" is not a factual determination that lay persons, albeit judges, are capable of making without benefit of medical testimony. A person who might take such extreme action as suicide may do so either as a result of mental illness or from a desire to communicate a deep protest against government policy. As judges, we would need the studied opinion of a qualified physician to choose between such alternatives.

As the Supreme Court stated in *Addington v. Texas* (1979), 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323:

> Whether the individual is mentally ill and dangerous to either himself or others and is in need of confined therapy turns on the *meaning* of the facts which must be interpreted by expert psychiatrists and psychologists. (original emphasis.)

441 U.S. 418 at 429, 99 S.Ct. 1804 at 1811.

The majority discounts the need for and value of the involvement of physicians in involuntary commitment proceedings. The majority indicates that, in a properly decided case, expert testimony about whether a person's dangerous conduct is causally related to the person's mental illness would not make that link any more clear to a court than would the factual circumstances alone. I disagree. Had the legislature believed as the majority does, the legislature would not have made it necessary to include either a physician's testimony or a physician's report in virtually every step of our involuntary commitment process.

The majority states that some dangerous conduct is so apparently linked to a person's mental illness that the causal relationship between the person's illness and the conduct is apparent on its face. For examples of such conduct, the majority points to an individual who compulsively ran into traffic for no apparent reason and an individual who wandered about aimlessly through traffic on a freeway ramp. The conduct called into question in J.B.'s case is not so different from the conduct cited by the majority. J.B.'s mother testified that J.B. was an individual who walked out in front of cars, and who jumped out of the mother's car at busy intersections and ran through traffic. In addition, the record shows that J.B. had during the same time frame driven an automobile while intoxicated. The evidence was clear that J.B. had severe problems due to alcoholism and that her consumption and problems were increasing.

The majority discounts and holds of no probative value the following testimony of Dr. Detrana, the resident physician, who had treated and examined J.B.:

Q. You have heard her mother testify as to what she has done while she has been drinking. Do you feel that that is a manifestation of her illness?

A. Yes, I do.

Q. Do you feel that those manifestations can make her dangerous to herself?

A. Yes, they can.

Q. Do you feel that they may potentially make her dangerous to others?

A. Yes, I do.

\* \* \* \* \* \*

Q. Dr. Detrana, you began to explain why you felt, on the 26th, that she was commitable [sic]. Why was ... what changed your mind?

A. I felt that she was gravely disabled and a danger to herself by reading the trouble that she had gotten into in the past month due to her alcoholism. She had previously not admitted to me.

(Record, pp. 77, 82)

I believe that the majority has concluded that the basis for Dr. Detrana's opinion is inadequate and, in an effort to avoid an apparent reweighing of the evidence, has generated a sort of *per se* test which allows the appellate court to substitute its judgment for that of the trial court. Although I might have come to a conclusion contrary to that of the trial court, I cannot say that the trial court erred in agreeing with the opinion of Dr. Detrana. Dr. Detrana's opinion was based on her examination of the patient and her history, and her opinion was that J.B.'s conduct of exposing herself to the dangers of traffic and of

going off with strangers was a manifestation of her mental illness which was alcoholism. This, together with the mother's description of J.B.'s actions, the driving while intoxicated, and the court's opportunity to observe J.B. and listen to her testimony, provides an adequate basis for the trial court's decision.

I believe the majority, in the understandable desire to protect the mentally ill who are not dangerous or gravely disabled from unwarranted commitment, has developed a standard for review of the factual basis for commitment that calls for judges to make a threshold determination that conduct is a result of mental illness without benefit of medical testimony as to causation. The standard suggested by the majority, as I understand it, is that the conduct must be such that a lay person (judge) would recognize that it could only result from mental illness. Only if that is the case could the court accept a medical opinion that the conduct was a result of the mental illness. I have overstated the matter to illustrate the problem I have with the majority.

Here, the trial court had before it the testimony of J.B., her mother, and Dr. Detrana, from which the court could infer that J.B. had engaged in conduct which created a risk of physical harm to her and that that conduct was a result of her addiction to alcohol. The trial court could have concluded that it would not accept Dr. Detrana's opinion and that would have been that. It did accept the opinion and there was a factual basis for the opinion. That the majority is not prepared to accept the opinion or to find the facts favorable to the trial court judgment of sufficient weight is not a basis for reversal.

I respectfully dissent and would affirm the trial court order of commitment.