## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Aug 25 2017, 8:50 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Ruth A. Johnson
Marion County Public Defender Agency
Appellate Division
Indianapolis, Indiana

Joel M. Schumm
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Phyllis J. Garrison
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Civil Commitment of K.E.,

K.E.,

*Appellant-Respondent,*

v.

Eskenazi Health/
Midtown Community Mental
Health Center,

*Appellee-Petitioner.*

August 25, 2017

Court of Appeals Case No.
49A02-1703-MH-579

Appeal from the
Marion Superior Court

The Honorable
Steven R. Eichholtz, Judge

Trial Court Cause No.
49D08-1702-MH-5753

**Kirsch, Judge.**

[1] K.E. appeals the trial court's order granting Eskenazi Health/Midtown Community Mental Health Center's ("Eskenazi") petition for her involuntary temporary commitment. On appeal, K.E. contends that the evidence was insufficient to prove that she was "dangerous" or "gravely disabled," as required for an involuntary temporary commitment under Indiana Code section 12-26-6-1. Finding sufficient evidence that K.E. was dangerous to others, we affirm.

## Facts and Procedural History

[2] In October 2016, K.E. lived with her husband and fifteen-year-old daughter ("youngest daughter") in Marshall, Illinois. K.E.'s adult daughter, Linda, had lived with K.E. until September 2016, when K.E. "kicked" her out. *Tr. Vol. II* at 20. In February 2017, K.E. went to Indianapolis to visit her husband, who had been admitted to the VA hospital to be treated for malnutrition. K.E. testified that she began her travel from Marshall to Indianapolis first by walking, but once she got to Terre Haute, a stranger gave her a ride to that city's bus station. After arriving in Indianapolis, K.E. sought voluntary mental health treatment from Eskenazi. A few days later, Eskenazi filed a petition asking for K.E.'s temporary, involuntary commitment.

[3] On February 22, 2017, the trial court held a commitment hearing at which Linda, K.E, and Dr. Shariff Tanious ("Dr. Tanious"), an Eskenazi psychiatrist, testified. Dr. Tanious stated that he had treated K.E. since she was admitted, and, in his professional opinion, K.E. was suffering from schizoaffective disorder; Dr. Tanious based his diagnosis on K.E.'s "delusions and

disorganized, illogical behavior as well as historical review of the previous history of a mood component in conjunction with her psychosis." *Id.* at 9.

[4] It was Dr. Tanious's opinion that K.E. was dangerous to her family. Dr. Tanious testified that K.E.'s mental illness caused her to have the ongoing delusion that methamphetamine was being manufactured on a property near her Illinois home and that the fumes from that operation were poisoning her family. *Id.* K.E. believed that she had to "hit or abuse her family" "to get the Meth Fumes out," and she admitted that these acts "left bruises." *Id.* at 9, 12. K.E.'s delusions also led her to shave the heads of her husband and youngest daughter, believing it was necessary to purge poison[1] from their bodies. *Id.* at 12. When asked if her family consented to having their heads shaved, K.E. said "well they never said anything, they were just crying during that time." *Id.* K.E. admitted that she "had abused" her husband and youngest daughter "in the sense of withholding food." *Id.* At the time leading up to her commitment, K.E. had no stable means of support. K.E. made money only through donating plasma. K.E. believed that, since she earned the money, she "[m]ade the decision about food." *Id.* K.E.'s food decisions resulted in her husband being admitted to a hospital for treatment of malnutrition. *Id.* at 13. Dr. Tanious testified that K.E. firmly believes "that these are rational and logical actions and

---

[1] Some portions of Dr. Tanious's testimony were inaudible. Regarding K.E. having shaved the head of her husband and youngest daughter, Dr. Tanious testified, "[K.E.] has said that she shaved her husband's and daughter's hair because she was trying to- – that was her way of determining (inaudible due to background noise) were purged from their body." *Tr. Vol. II* at 12. In its brief, Eskenazi assumes that K.E. shaved the heads of her family due to her fear the meth fumes were poisoning her family. *Appellee's Br.* at 5.

has no insight into the delusions that are causing her to behave in this manner." *Id*. at 12. Dr. Tanious opined that K.E. was a danger to others simply because the delusions made her believe that her actions were appropriate. *Id*.

[5] Linda testified that she became afraid for her sister's safety when she learned that K.E. planned to take her youngest daughter, on foot, to Washington D.C. to talk to President Trump. *Id*. at 20. Linda testified that she knew she could do nothing to stop her mother, but believed she could do something to save her sister. *Id*. Linda's fear caused her to call the local sheriff, who removed the girl from K.E.'s home and placed her with a relative. *Id.* Because of K.E.'s erratic actions, her husband and youngest daughter no longer live with her. Linda believed it was in K.E.'s best interest to be under temporary commitment so that she could get the help she needed to get back on medication and get her life back together. *Id*. at 21-22.

[6] Dr. Tanious also believed that K.E.'s mental illness caused her to be gravely disabled, in part, because she had no insight into the fact that she was suffering from a mental illness. While admitting that she had taken medications in the past, K.E. refused medications while at Eskenazi. K.E. said that the medications do not help. *Id*. at 11. Dr. Tanious testified that, when K.E. arrived at Eskenazi, "she was so preoccupied with her delusions that she [had been] unable to care for herself in a less restrictive environment." *Id.* at 10-11. K.E. lacked any insight into her condition and did not understand that her delusions "are causing her to behave in this manner." *Id.* at 12. Furthermore, although K.E. expressed a desire to leave Eskenazi, and had "been provided

many opportunities to engage in discharge planning," "she hasn't been able to cooperate" with a discharge plan. *Id.* at 11. Dr. Tanious testified that K.E. "ended up calling the VA hospital in Buffalo, and/or requesting numbers for Homeland Security[,] things of that nature." *Id.*

[7] As evidence that K.E. was gravely disabled, Linda testified that she was at K.E.'s home a few weeks before the commitment hearing. *Id.* at 18.

> There was cat puke everywhere. Dishes [were] piled up. Rat feces and urine.[2] The litter box look[ed] like it ha[d]n't been changed in months. Clothes scattered all over the floor. Cat and dog fee [sic] and feces on the floor. The whole house smell[ed] like cat urine.

*Id.* Linda explained that K.E. had been diagnosed as suffering from a mental illness and began taking medication for her condition about sixteen years prior to the commitment hearing. *Id.* at 19. However, without explanation, K.E. stopped taking her medication in September 2016. *Id.* Linda said, "[S]he did great on medication until she stopped." *Id.* at 19. Linda testified that, after stopping medication, K.E. became very moody, jumping from one mood to the next. "One second she's calm, and the next she is really mad, the next she is crying. *Id.* at 20. Further, K.E. "kicked" out Linda, Linda's boyfriend, and their baby "because [K.E.] believed that [Linda's] boyfriend was going to kill us. And she really had no reason to believe that." *Id.* After stopping

---

[2] It is not clear whether this was a typographical error and should have been "cat."

medication, K.E. "believed people were making meth. She thought people were in her walls. Just a whole lot of different things." *Id*. Following the hearing, the trial court ordered a temporary commitment, finding that K.E. was suffering from a mental illness and was both dangerous and gravely disabled. K.E. now appeals.

## Discussion and Decision

[8] K.E. challenges her temporary commitment to Eskenazi, arguing that there was insufficient evidence to support the findings that she was "dangerous" or "gravely disabled."[3] A trial court may order temporary involuntary commitment of an individual for a period of up to ninety days if a petitioner proves by clear and convincing evidence that the individual is: (1) mentally ill; and (2) either dangerous or gravely disabled. Ind. Code § 12-26-6-1. Civil commitment is a significant deprivation of liberty that requires the petitioner to "show that the individual suffers from something more serious than is demonstrated by idiosyncratic behavior." *In re Involuntary Commitment of A.M.*, 959 N.E.2d 832, 835 (Ind. Ct. App. 2011) (citations omitted). When reviewing an order of commitment, we look to the evidence most favorable to the trial court's decision and draw all reasonable inferences from that decision. *In re*

---

[3] K.E.'s initial commitment was scheduled to expire on May 23, 2017, and there is no evidence in the record before us that Eskenazi requested an extension of that commitment. Accordingly, K.E.'s temporary commitment may have already expired, thus making this appeal moot. Generally, we do not discuss moot issues; however, we have previously found that the treatment of a person subject to involuntary commitment is an issue of great importance to society, which we may address on the merits even if it is moot. *M.E. v. Dep't of Veteran's Affairs*, 64 N.E.3d 855, 859 n.3 (Ind. Ct. App. 2016); *Golub v. Giles*, 814 N.E.2d 1034, 1036 n.1 (Ind. Ct. App. 2004), *trans. denied*. We, therefore, elect to address the merits of the instant appeal.

*Commitment of T.K.*, 993 N.E.2d 245, 249 (Ind. Ct. App. 2013), *trans. denied*; *Golub v. Giles*, 814 N.E.2d 1034, 1038 (Ind. Ct. App. 2004), *trans. denied*. We may neither reweigh the evidence nor judge the credibility of the witnesses. *Id.*

[9] K.E. does not challenge the finding that she suffers from a mental illness. Instead, she contends that neither of the necessary alternative elements, "dangerous" or "gravely disabled," were proven by clear and convincing evidence.[4] *T.K. v. Dep't of Veterans Affairs*, 27 N.E.3d 271, 274 (Ind. 2015)*. Id.* K.E. argues that the evidence was insufficient to prove that she was dangerous to others.[5] *Appellant's Br.* at 11-12. "An individual is 'dangerous' when, as a result of mental illness, the individual presents a substantial risk that [s]he will harm [her]self or others." *M.E. v. Dep't of Veterans Affairs*, 64 N.E.3d 855, 861 (Ind. Ct. App. 2016) (citing Ind. Code § 12-7-2-53). When certain conduct is

---

[4] Eskenazi recognizes that K.E. can only be involuntarily committed if it proves by *clear and convincing evidence* that K.E. suffers from a mental illness and is either dangerous or gravely disabled. *Appellee's Br.* at 7 (emphasis added). Eskenazi also asserts, "If the trial court's commitment order *represents a conclusion that a reasonable person could have drawn*, the order must be affirmed, even if other reasonable conclusions are possible." *Id*. (emphasis added). K.E. correctly notes in her reply brief that, in *T.K. v. Department of Veterans Affairs*, 27 N.E.3d 271, 273-74 (Ind. 2015), our Supreme Court recently disapproved of a line of cases that recited the phrase "clear and convincing," but "affirmed civil commitment orders merely if such an order represent[ed] a conclusion that a reasonable person could have drawn, even if other reasonable conclusions are possible." *T.K.*, 27 N.E.3d at 274 (quotation marks and citations omitted). Accordingly, here, we follow the standard in *T.K.*, "whether, considering the probative evidence and reasonable inferences favorable to judgment, the trial judge could have found by clear and convincing evidence that [K.E.] was either dangerous or gravely disabled." *Id.*

[5] Part of K.E.'s argument is that the timing of events supporting the commitment are not specific, and therefore, the evidence supporting the finding of "dangerous" is insufficient. We disagree. Linda testified that K.E. stopped taking her medication in late September 2016, causing K.E.'s mood to change soon thereafter. *Tr. Vol. II* at 19. The events that Dr. Tanious and Linda testified to occurred between October 2016 and February 2017. Furthermore, K.E.'s mental illness affected her judgment as recently as two weeks prior to the hearing when, in early February 2017, K.E. decided it was reasonable to walk from Marshall, Illinois to Indianapolis.

alleged to be dangerous, we must consider whether "the conduct is an instance of everyday risk-taking behavior." *J.B. v. Midtown Mental Health Ctr.*, 581 N.E.2d 448, 451 (Ind. Ct. App. 1991), *trans. denied*. Dangerousness must be shown through behavior that would not occur but for the person's mental illness. *B.M. v. Ind. Univ. Health*, 24 N.E.3d 969, 972 (Ind. Ct. App. 2015), *trans. denied sub nom. In re Mental Health Proceedings of B.M.*, 30 N.E.3d 1229 (Ind. 2015). A trial court need not wait until an individual commits a physical act before deciding that the individual poses a substantial risk of harm to others. *Id*.

[10]   Here, Dr. Tanious testified that K.E.'s mental illness produced an ongoing delusion that methamphetamine was being manufactured in a property near her Illinois home and that fumes from that operation were poisoning her family. *Tr. Vol. II* at 9. K.E. believed that she had to "hit or abuse her family" "to get the [m]eth [f]umes out," and she admitted to Dr. Tanious that she "left bruises." *Id*. at 9, 12. K.E.'s delusions led her to: (1) shave the heads of her husband and youngest daughter, who cried while their heads were being shaved; (2) evict Linda and her family, fearing that Linda's boyfriend would kill them; (3) sometimes withhold food from her husband and youngest daughter, which resulted in her husband becoming malnourished; and (4) believe that it was reasonable for her youngest daughter to walk from Marshall, Illinois to Washington, D.C. Dr. Tanious testified that K.E. believed these were rational and logical actions, and she had no insight into the fact that the delusions were driving her odd behaviors. *Id*. at 12. Dr. Tanious opined that K.E. was "a

danger to others simply through her belief of these delusions that she is acting appropriately." *Id*. K.E.'s conduct was not "an instance of everyday risk-taking behavior." *Commitment of J.B.*, 581 N.E.2d at 451. Instead, K.E.'s behavior would not have occurred but for her mental illness. While K.E. argues that there was no evidence that she engaged in violence or threatened physical force, a trial court need not wait until an individual commits a physical act before deciding that the individual poses a substantial risk of harm to himself or others. *Id*. The evidence presented by Eskenazi was sufficient to prove by clear and convincing evidence that K.E. was dangerous to others.

[11] Because Indiana Code section 12-26-6-1 is written in the disjunctive, clear and convincing proof that K.E. is dangerous to others was sufficient on its own to support the trial court's judgment that it was appropriate to temporarily commit K.E. *See A.L. v. Wishard Health Servs., Midtown Cmty. Mental Health Ctr.*, 934 N.E.2d 755, 762 (Ind. Ct. App. 2010) (having proved that commitment was proper due to patient's grave disability, dangerousness did not also have to be proven), *trans. denied*. Here, Eskenazi proved by clear and convincing evidence that K.E. is dangerous. We affirm the trial court's decision to temporarily commit K.E.

[12] Affirmed.

Najam, J., and Brown, J., concur.