## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 14 2017, 10:20 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

James A. Shoaf
Columbus, Indiana

ATTORNEY FOR APPELLEE

Steven J. Cohen
Zeigler Cohen & Koch
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the
Commitment of S.W.,

*Appellant-Respondent,*

v.

Columbus Regional Hospital
Mental Health Center,

*Appellee-Petitioner.*

November 14, 2017

Court of Appeals Case No.
03A04-1706-MH-1344

Appeal from the Bartholomew
Superior Court

The Honorable James D. Worton,
Judge

Trial Court Cause No.
03D01-1705-MH-2984

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Respondent, S.W., appeals the trial court's grant of Appellee-Petitioner's, Columbus Regional Hospital Mental Health Center (Columbus Regional Hospital), request for regular commitment.

We affirm.

# ISSUE

S.W. raises one issue for our review, which we restate as: Whether Columbus Regional Hospital presented sufficient evidence to support the trial court's order of regular commitment.

# FACTS AND PROCEDURAL HISTORY

S.W., fifty-five years old at the time of the trial court proceedings, has a history of mental illness and has previously been diagnosed with schizophrenia and schizoaffective disorder. She attempted suicide in December 2013 after refusing to take her medication and experiencing severe auditory hallucinations. Since 2014, S.W. has been admitted at the Columbus Regional Hospital on five different occasions and has previously been placed under a temporary commitment order.

On May 26, 2017, S.W. was admitted to the mental health unit at Columbus Regional Hospital, after S.W.'s daughter had sought emergency detention of her at Centerstone treatment facility due to concerns that S.W. had started experiencing auditory hallucinations and had become paranoid. S.W. had

become delusional in believing that her neighbors had been coming into her home, poisoning her food, threatening her, and taking her clothes and money. She also believed that she was five months pregnant with twins fathered by "Joseph from the Bible." (Transcript p. 25). S. W. described her auditory hallucinations "as angels talking to her." (Tr. p. 25). She used her pregnancy as a reason for her refusal to take her medications.

[6] That same day, May 26, 2017, Columbus Regional Hospital completed an application for emergency detention of a mentally ill and dangerous person, alleging that S.W. was believed to be a person suffering from a psychiatric disorder, who was dangerous to herself because she was "delusional, psychotic, [and a] risk to herself," and that if not immediately restrained, she "would harm herself." (Appellant's App. Vol. II, p. 43). The application was accompanied by a physician's emergency statement, signed by S.W.'s in-patient psychiatrist, Dr. Michael Stark (Dr. Stark). Dr. Stark opined that, based on his examination of S.W., S.W. "may be mentally ill and dangerous" and diagnosed her as being "delusional." (Appellant's App. Vol. II, p. 44). She "believed neighbors were breaking into her apartment and poisoning her food, worried she was being poisoned at the hospital, and believed she was pregnant." (Appellant's App. Vol. II, p. 44). Based on the application and Dr. Stark's physician's statement, S.W. was detained at the Columbus Regional Hospital on an emergency basis.

[7] Also on May 26, 2016, Columbus Regional Hospital filed a report following emergency detention with the trial court, supported by a physician's statement completed by Dr. Stark. Upon examining S.W., Dr. Stark opined that S.W.

suffered from schizoaffective disorder which made her dangerous to herself. Dr. Stark referred to S.W.'s "history of attempting suicide when not compliant with psychiatric meds and auditory hallucinations [which became] predictably worse." (Appellant's App. Vol. II, p. 41). Despite two negative pregnancy tests, S.W. continued to believe that she was pregnant and insisted that she felt movement in her stomach. Dr. Stark concluded that S.W. had experienced "a substantial impairment or obvious deterioration in judgment, reasoning, or behavior that resulted" in her inability to function independently. (Appellant's App. Vol. II, p. 41). Dr. Stark again noted her history of attempting suicide when not compliant with her psychiatric medication and worsening auditory hallucinations. He opined that S.W. was in need of custody, care or treatment in an appropriate facility and that outpatient services would not be adequate as S.W. could not be relied upon to take her medication. According to the statement, Dr. Stark had discussed with S.W. "the advisability of obtaining treatment on a voluntary basis," which she had refused. (Appellant's App. Vol. II, p. 42). Therefore, Dr. Stark suggested a regular commitment with an initial inpatient admission until antipsychotic medication could be initiated and S.W.'s condition could be stabilized.

[8] On June 1, 2017, the trial court conducted a regular commitment hearing, during which testimony was received from Dr. Stark and S.W. At the completion of the hearing, the trial court issued an Order of regular commitment, finding that S.W. suffered from a mental illness, as defined by Ind. Code § 12-7-2-130(1), that she was dangerous to herself, in accordance

with I.C. § 12-7-2-53, and that she was gravely disabled, pursuant to I.C. § 12-7-2-96. The trial court concluded that S.W. was in need of commitment for a period expected to exceed ninety days and that the appropriate facility where she could receive rehabilitative treatment or rehabilitation and care was as an inpatient at the Columbus Regional Hospital until stabilization, with transition to outpatient services through Centerstone. The trial court authorized the staff at Columbus Regional Hospital to administer whatever treatment was deemed necessary for S.W., with or without her consent.

[9] S.W. now appeals. Additional facts will be provided if necessary.

# DISCUSSION AND DECISION

[10] S.W. contends that the trial court abused its discretion in ordering a regular commitment because the evidence supports that S.W.'s commitment is not "reasonably expected to require custody, care or treatment in a facility for more than ninety days." *See* I.C. § 12-26-7-1(2).

[11] The purpose of civil commitment proceedings is dual: to protect the public and to ensure the rights of the person whose liberty is at stake. *In re Commitment of Roberts*, 723 N.E.2d 474, 476 (Ind. Ct. App. 2000). The liberty interest at stake in a civil commitment proceeding goes beyond a loss of one's physical freedom, and given the serious stigma and adverse social consequences that accompany such physical confinement, a proceeding for an involuntary civil commitment is subject to due process requirements. *See Addington v. Texas*, 441 U.S. 418, 426-26, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). To satisfy these requirements of due

process, the facts justifying an involuntary commitment must be shown "by clear and convincing evidence . . . [which] not only communicates the relative importance our legal system attached to a decision ordering an involuntary commitment, but . . . also has the function of reducing the chance of inappropriate commitments." *Commitment of J.B. v. Midtown Mental Health Ctr.*, 581 N.E.2d 448, 450 (Ind. Ct. App. 1991), *trans. denied*.

[12]  In reviewing the sufficiency of the evidence supporting a determination made under the statutory requirement of clear and convincing evidence, an appellate court will affirm if, "considering only the probative evidence and the reasonable inferences supporting it, without weighing evidence or assessing witness credibility, a reasonable trier of fact could find [the necessary elements] proven by clear and convincing evidence." *Civil Commitment of T.K. v. Department of Veteran Affairs*, 27 N.E.3d 271, 273 (Ind. 2015).

[13]  Accordingly, the issue presented in this case is whether, considering the probative evidence and reasonable inferences favorable to the judgment, the trial court could have found by clear and convincing evidence that S.W. was either dangerous or gravely disabled. "Dangerous" is "a condition in which an individual as a result of mental illness, presents a substantial risk that the individual will harm the individual or others." I.C. § 12-7-2-53. "Gravely disabled" is defined as:

> A condition in which an individual, as a result of mental illness,
> is in danger of coming to harm because the individual:

(1) Is unable to provide for that individual's food, clothing, shelter, or other essential human needs; or

(2) Has a substantial impairment or obvious deterioration of that individual's judgment, reasoning, or behavior that results in the individual's inability to function independently.

I.C. § 12-7-2-96.

[14] S.W. does not challenge the trial court's finding that she is mentally ill, dangerous, or gravely disabled. Rather, the crux of the case is whether Columbus Regional Hospital presented sufficient evidence to support its allegation that S.W. "is in need of commitment to an appropriate facility for . . . a period expected to exceed ninety days." She maintains that the "evidence presented at the hearing was that within a few days of the hearing, S.W. would be released from the facility to outpatient services." (Appellant's Br. pp. 8-9).

[15] The first time that a person is subjected to a commitment proceeding, a trial court may only order temporary commitment of the person, which cannot exceed ninety days. *See* I.C. §§ 12-26-5-11(c); -6-1. However, the evidence reflects that S.W. had been under a previous commitment order in 2014 and therefore, "a trial court may order a regular commitment, which can be of indefinite length." *See* I.C. §§ 12-26-5-11(d); -7-5. Specifically, the regular commitment continues

until any of the following occurs:
(1) The individual had been:
(A) Discharged from the facility; or

(B) Released from the therapy program.
(2) The court enters an order:
(A) Terminating the commitment; or
(B) Releasing the individual from the therapy program.

I.C. § 12-26-7-5(b).

[16] Testifying about S.W.'s treatment plan and least restrictive placement, Dr. Stark explained that due to S.W.'s history of suicide attempts when not taking her medicine, her poor compliance with her medication regime, and her lack of insight into her diagnosis, he "would like to get her on a depo, long acting monthly injectable." (Tr. p. 7). Then, "hopefully stabilize her with that and then discharge her home with outpatient services through Centerstone." (Tr. p. 8). Dr. Stark clarified that "[i]t would probably [be] four days to, to properly administer that. It would probably require two shots." (Tr. p. 9). "And assuming that her symptoms improve with that, you know four or five days, I think would be a reasonable time frame going forward." (Tr. p. 9). S.W. would then be required to go into Centerstone and get a monthly shot. Dr. Stark elaborated that if she was not compliant with the monthly injection schedule, she could potentially be re-admitted to Columbus Regional Hospital "to ensure that she should stay on the medicine." (Tr. p. 10).

[17] Accordingly, in light of S.W.'s previous temporary commitment, the trial court properly ordered regular commitment of S.W. Based on Dr. Stark's testimony, clear and convincing evidence supports that S.W.'s entire treatment plan consists of an inpatient hospital stay, combined with an outpatient therapy component. Although the initial admission at Columbus Regional Hospital is

short in duration, S.W.'s monthly participation at Centerstone is a crucial element for the continued success of her treatment and will encompass numerous months, exceeding the ninety day period, as envisioned in the regular commitment order. Therefore, we affirm the trial court's regular commitment order.

## CONCLUSION

[18] Based on the foregoing, we conclude that Columbus Regional Hospital presented clear and convincing evidence to support the regular commitment order.

[19] Affirmed.

[20] Robb, J. and Pyle, J. concur