


FILED

Jun 24 2025, 1:33 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE

# Indiana Supreme Court

Supreme Court Case No. 25S-MH-153

## In the Matter of the Civil Commitment of J.W.,
*Appellant-Respondent,*

–v–

## Community Fairbanks Behavioral Health,
*Appellee-Petitioner.*

Decided: June 24, 2025

Appeal from the Marion Superior Court
No. 49D08-2504-MH-16199
The Honorable David J. Certo, Judge

**Per Curiam Opinion**

Chief Justice Rush and Justices Massa, Slaughter, Goff, and Molter concur.

**Per curiam.**

Just weeks ago, we reiterated that temporary involuntary civil commitment proceedings have a dual purpose: protecting the public and ensuring the rights of the person whose liberty is at stake. *J.F. v. St. Vincent Hosp. and Health Care Ctr., Inc.*, 256 N.E.3d 1260, 1264 (Ind. 2025) (quoting *T.K. v. Dep't of Veterans Affs.*, 27 N.E.3d 271, 273 (Ind. 2015)). To that end, our legislature has expressly authorized the use of outpatient therapy programs during involuntary commitments when such programs are likely to be a safe and beneficial alternative to inpatient treatment. Here, the trial court recognized the need for precisely this approach.[1] And while the Court of Appeals reversed the commitment, we issued an order on June 18, 2025, granting transfer and affirming the trial court. We now explain our reason for doing so.

## I. Background and Procedural History

On Friday, April 4, 2025, thirty-five-year-old J.W. called the crisis center at Community Fairbanks Behavioral Health ("Community") due to suicidal ideation. After speaking with the hotline specialist, J.W. grabbed one of his firearms and got in his car. He eventually drove to the crisis center and checked himself in. J.W. has a history of suicidal ideation and attempted suicide at least once. He was the subject of a commitment proceeding in August 2015. And he voluntarily sought treatment at Community for depression in October 2020. Community discharged J.W. following that stay with antidepressants and an outpatient treatment plan. But J.W. "was ultimately lost to follow up" treatment. Tr. at 9.

Although J.W. checked himself in for treatment on April 4, he wanted to leave that same day. He did not believe inpatient treatment would help

---

[1] This expedited appeal is part of the two-year Marion County Expedited Mental Health Appeals Pilot Project, which we established to address the challenge that "[t]he typical duration of temporary mental health commitments often exceeds the standard appellate timeline." *In re Marion Cnty. Expedited Mental Health Appeals Pilot Project*, No. 24S-MS-190, Order p. 1 (Ind. July 16, 2024).

him, as he would "figure out a way to just do it when he's outside of the hospital." *Id.* at 14. J.W. clarified that he was referring to ending his life. He voiced feelings of hopelessness and isolated himself in his room. Staff had concerns for his lack of appetite. Dr. Zainab Shah evaluated J.W. twice a day for three days. She diagnosed him with Bipolar II disorder, which is typically characterized by hypomanic and major depressive episodes. Dr. Shah acknowledged she had not witnessed J.W.'s hypomanic symptoms. But J.W. self-reported a "decreased need for sleep, elevated mood, some impulsive decision making, and intense goal-driven activity." *Id.* at 10. Dr. Shah believed J.W. was currently experiencing a major depressive episode, and his minimal response to antidepressants supported the Bipolar II diagnosis. Dr. Shah started J.W. on Latuda. It typically takes four to five days for symptoms to improve on Latuda, although the medication's effectiveness varies by individual. *Id.* at 31.

On Monday, April 7, Community filed a "Report Requesting Temporary Commitment of Voluntary Patient" in the Marion Superior Court. The report noted that J.W. was "[actively] suicidal with plan and access to means, he wishes to leave without any safety planning, will not allow the hospital to contact collateral, and has not displayed an ability to keep himself safe." Appellant's App. Vol. II, p. 5. The report's attached "Physician's Statement" concluded that J.W. "presents a substantial risk of harm to self[.]" *Id.* at 7. Indeed, J.W. continued to endorse suicidal ideation on April 7, the day Community filed the report. And J.W. was concerned that, without follow-up care, he would "end up back [in the hospital]" or dead. Tr. at 10. But he also admitted he would lie about his suicidal ideation in order to leave the hospital sooner. *Id.* at 9. The trial court set a hearing for April 9.

J.W. accepted his diagnosis and was compliant with medication while at Community. His symptoms began to improve, and he became more social. But Dr. Shah believed J.W. still lacked "awareness into the severity" of his Bipolar II diagnosis and its associated safety risks, as twenty percent of individuals with bipolar disorder die by suicide. *Id.* at 11, 13. And chronic depression, feelings of hopelessness, and access to weapons—all factors endorsed by J.W.—increase a patient's risk for dying by suicide. *Id.* at 13.

During the April 9 hearing, J.W. denied having suicidal thoughts. He testified he was feeling much better and was "very encouraged by the new diagnosis and the new medication[.]" *Id.* at 35. He believed outpatient therapy would be more beneficial for him than inpatient treatment since his care inside Community had been "very minimal." *Id.* J.W. disagreed with Dr. Shah's assessment of his sociability and appetite. And he noted that despite having mental illness for years, he had never used any of his hunting firearms to inflict self-injury. Regardless, J.W. asked his wife to give his firearms to his brother, a state trooper, for the time being. J.W. expressed concern for his employment should he stay at the hospital much longer.

Dr. Shah wished to keep J.W. at Community "til the end of this week[,] til Friday, April 11, possibly" to continue treating him with Latuda. *Id.* at 16. That timeframe would allow staff to establish outpatient treatment—including electroconvulsive therapy—and identify a psychiatrist for J.W. *Id.* J.W. was open to outpatient treatment, but Dr. Shah believed a commitment was necessary to ensure J.W. complied. *Id.* at 25. She noted that J.W. had previously failed to attend his outpatient appointments, and he "consistently dismissed or [minimized] therapeutic interventions and alternative treatment options" during his current admission. *Id.* at 11. Dr. Shah acknowledged that J.W. could function outside the hospital and go to work. *Id.* at 28.

At the hearing's conclusion, the trial court addressed J.W.:

> I'm especially grateful for Dr. Shah's expert psychiatric insights. But Dr. Shah doesn't agree with you, and I choose to believe her expert psychiatric insights in some respects. And I need you to trust her, too. This matter is placed in front of me today because of the danger, not that you've posed to yourself, but that bipolar disorder has posed to you. And bipolar disorder wants to take everything from you. So one father and husband to another, I plead with you to listen to Dr. Shah and her psychiatric insights. … If you were discussing the possibility of suicide as recently as 48 hours ago, I hope that you're as concerned as I am. And when Dr.

> Shah says that it is very likely you'll be ready for discharge with good planning for discharge by Friday. I trust your judgment and I encourage you to do that. That doesn't mean, sir, that if you need longer than that, you shouldn't stay. I plead with you to be a little selfish for your benefit and for your family's.

*Id.* at 47. The trial court issued an "Order of Temporary Commitment" that same day. It found, "[J.W.] remains a danger to himself and gravely disabled in his judgment and reasoning, as his psychiatrist opines he accepts his diagnosis but does not adequately appreciate the grave danger of bipolar depression. He spoke about suicidal intentions just 2 days ago, and his doctor believes he will benefit sufficiently from medication to discharge safely in 2 more days. The court shares the concern [J.W.] voiced to his doctor that he would return to the hospital or commit suicide without effective intervention." Appellant's App. Vol. II, p. 22. J.W.'s commitment would expire on July 8.

J.W. appealed and, in a split decision, the Court of Appeals reversed. *J.W. v. Cmty. Fairbanks Behav. Health*, No. 25A-MH-912 (Ind. Ct. App. May 28, 2025) (mem.), *vacated*. It determined Community failed to establish "by clear and convincing evidence that J.W. should be placed under an involuntary temporary commitment." *Id.* at *1. For support, it cited the trial court's statement that J.W.'s diagnosis posed a danger, as "the critical inquiry is whether the individual is both mentally ill, which is conceded, *and dangerous to himself or others*. … The court's statement appears to conflate the two distinct requirements." *Id.* at *4 (emphasis in original). It also pointed to Community's plan to discharge J.W. from inpatient treatment two days after the hearing:

> We find it hard to reconcile that J.W. is "dangerous" if Community's plan was to release him to outpatient treatment in just two more days' time. And we are concerned with why Community is now taking the position of committing him to inpatient treatment. In other words, had J.W. not objected to their determination, would Community have released him two days later? The plan to release him suggests that

> Community did not consider him to be "dangerous" until he
> disagreed with how long he should remain in inpatient care.

*Id.* Finally, it determined Community failed to show by clear and convincing evidence that J.W. was gravely disabled. *Id.* at 5.

Judge Tavitas dissented. Although she agreed that Community failed to prove "grave disability," she believed the majority reweighed evidence to find J.W. did not pose a danger to himself. *Id.* at 6. She further noted that committed individuals may be placed on outpatient status. *Id.* at 6, n.2. We previously granted transfer, vacated the Court of Appeals' decision, and affirmed the trial court by order. Ind. App. R. 58(A). This opinion more fully explains our decision.

## II. The Court of Appeals reweighed evidence to reverse the trial court's judgment.

A trial court may temporarily commit a person who is mentally ill and either dangerous or gravely disabled to a facility for not more than ninety days. I.C. § 12-26-6-1. The petitioning facility must prove the statute's elements by clear and convincing evidence. *Id.* § -2-5(e). A person is "dangerous" if, "as a result of mental illness," there is a "substantial risk" that the person will harm himself or others. *Id.* § -7-2-53.

Appellate courts will affirm a civil commitment "if, 'considering only the probative evidence and the reasonable inferences supporting it, without weighing evidence or assessing witness credibility, a reasonable trier of fact could find [the necessary elements] proven by clear and convincing evidence.'" *T.K.*, 27 N.E.3d at 273 (quoting *Bud Wolf Chevrolet, Inc. v. Roberston*, 519 N.E.2d 135, 137 (Ind. 1988)). Probative evidence is that which "tends to prove or disprove a point in issue." *Galloway v. State*, 938 N.E.2d 699, 711 (Ind. 2010) (quoting Black's Law Dictionary 639 (9th ed. 2009)). And "[i]n order to be clear and convincing, the existence of a fact must be highly probable." *Commitment of B.J. v. Eskenazi Hosp./Midtown CMHC*, 67 N.E.3d 1034, 1038 (Ind. Ct. App. 2016).

Here, J.W. concedes he has a mental illness. Community no longer argues it offered clear and convincing evidence that J.W. is gravely disabled, and it has never argued that J.W. is at a substantial risk of harming others. So the only question remaining is whether Community offered clear and convincing evidence that J.W. poses a danger to himself. We agree with Judge Tavitas that the Court of Appeals reweighed evidence to find Community's showing was insufficient.

We find persuasive Community's argument that the Court of Appeals "credited" J.W.'s testimony and "dismissed" Dr. Shah's. Pet. at 4. The Court of Appeals noted that "J.W. exhibited behavior consistent with reducing risks [at the time of the commitment hearing], a mindset we should encourage others with mental health issues to achieve." *J.W.*, No. 25A-MH-912 at *4. But this conclusion ignores Dr. Shah's testimony that J.W. contemplated suicide as recently as two days before the commitment hearing and admitted he would lie about his suicidal thoughts to be released earlier. She also testified that the commitment was necessary to ensure J.W. complied with outpatient treatment. The trial court cited this testimony at the end of the hearing and in its commitment order. While we acknowledge J.W.'s perspective that commitment proceedings "encourage[ ] dishonesty" due to their "potential ramifications[,]" Tr. at 40, it remains the trial court's province to assess witness credibility, not ours. And whatever mindset we hope to encourage in patients does not alter that standard.

## III. Community's plan to discharge J.W. to outpatient treatment was not inconsistent with the trial court's judgment.

The Court of Appeals determined Community's plan to discharge J.W. to outpatient treatment two days after the hearing was irreconcilable with a finding that J.W. was dangerous. *J.W.*, No. 25A-MH-912 at *4. At least under these facts, we disagree.

A court may order an individual who is mentally ill and either dangerous or gravely disabled to enter an outpatient therapy program.

I.C. § 12-26-14-1. The court must make certain findings, including that the individual is likely to benefit from the program and not likely to be dangerous or gravely disabled while in compliance with the program. *Id.* § -1(2), (3). The individual's examining physician must also recommend outpatient programming. *Id.* § -1(4). An outpatient commitment is not without teeth, as the court can order the committed individual to attend appointments, reside at a certain location, and comply with other conditions, *id.* § -3, the failure of which may result in the individual's return to inpatient treatment, *id.* § -4(b).

Thus, outpatient treatment is a viable option for involuntary commitments. And all treatment options must be considered. *See In re Mental Commitment of M.P.*, 510 N.E.2d 645, 647 (Ind. 1987) ("It must be plain that there exists no less restrictive alternative treatment and that the treatment selected is reasonable and is the one which restricts the patient's liberty the least degree possible."). *See also* I.C. § 12-26-2-5(e)(2) (requiring the petitioner to prove that an individual's commitment is "appropriate"). The trial court here understood the available treatment options. *See* Tr. at 48 ("I'll order this temporary commitment not to exceed ninety days, which doesn't mean you have to stay at the hospital for ninety days. It means the court will be a partner with you. If you don't go to your treatment for follow-up, then sir, they can ask for a court order to have you taken there by the police. I don't want that. I don't think you need that either. But sir, I emphasize that because that's how commitments work.").

While we do not foreclose the possibility that a patient's planned imminent release from inpatient treatment may be evidence that a commitment is inappropriate, that is not the case here. First, Dr. Shah *hoped* to discharge J.W. two days after the commitment hearing, so long as there were no "ongoing safety concerns[.]" Tr. at 26. She was still uncertain how long J.W. would need to remain at Community at the time of the hearing. Second, J.W. had a history of failing to comply with outpatient treatment. And he minimized and "dismissed … therapeutic interventions and alternative treatment options" during his current hospitalization. *Id.* at 11. Dr. Shah believed a commitment was necessary to ensure J.W. adhered to an outpatient treatment plan, as it would not be "clinically safe" for J.W. to stop taking his medications once he felt better.

*Id.* at 25, 31. Although J.W. testified that he was willing to participate in outpatient treatment, the trial court "[chose] to believe [Dr. Shah's] expert psychiatric insights[,]" *id.* at 47, a decision we will not second guess.

J.W. correctly notes that Community did not proceed under I.C. ch 12-26-14 in the trial court. But it did not need to, as I.C. § 12-26-14-7 permits the superintendent of a facility—here, Community's chief administrative officer or designee, *see* I.C. § 12-7-2-188(3)—to place a committed individual on outpatient status "for the remainder of the individual's commitment period" without a court order, subject to certain conditions.

We agree with J.W. that appellate courts cannot merely "rubber stamp" a trial court's civil commitment decision. Certainly, the clear-and-convincing burden of proof "communicates the relative importance our legal system attaches to a decision ordering an involuntary commitment[.]" *Commitment of J.B.v. Midtown Mental Health Ctr.*, 581 N.E.2d 448, 450 (Ind. Ct. App. 1991). But we afford "considerable deference to the manner in which the legislature has balanced the competing interests involved" in civil commitments. *Collins v. Day*, 644 N.E.2d 72, 80 (Ind. 1994). And it has encouraged trial courts to consider—when safe and beneficial—outpatient treatment. Here, the trial court faithfully adhered to that directive.

## IV.  The trial court's empathetic statements did not conflate the statutory requirements.

Lastly, the trial court's statements did not conflate the requirements found in I.C. § 12-26-6-1. At the hearing's conclusion, the trial court explained its decision for committing J.W. The judge spoke at length to J.W., "one father and husband to another[.]" Tr. at 47. The judge observed, "This matter is placed in front of me today because of the danger, not that you've posed to yourself, but that bipolar disorder has posed to you." *Id*.

Viewed in the broader context of the judge's soliloquy, we take this statement to mean that J.W. is not to be blamed or feel shame for his mental health condition. And while J.W. is not defined by his diagnosis, he must appreciate its seriousness, its effects on his health, and the need

for continuing care from mental health professionals. The trial judge provided examples of the disorder's "lies," which cause patients to believe they do not need follow-up care or medication. The trial judge advised J.W., "[B]ipolar disorder wants to take everything from you." *Id.*

In other words, this trial judge expressed empathy for J.W. and wished to establish a personal connection with him, endeavors we should encourage in these sensitive proceedings.

# Conclusion

Having granted transfer and affirmed the trial court through our June 18, 2025 order, this opinion terminates the proceedings in this Court. Because this case is part of the Marion County Expedited Mental Health Appeals Project, the Clerk shall certify this opinion immediately.

Rush, C.J., and Massa, Slaughter, Goff, and Molter, JJ., concur.

ATTORNEYS FOR APPELLANT
Joel M. Schumm
Indianapolis, Indiana

Talisha Griffin
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Jenny R. Buchheit
Sean T. Dewey
Ice Miller LLP
Indianapolis, Indiana